500 P.2d 1304

BARBER'S SUPER MARKETS, INC., a New
Mexico corporation, Plaintiff-Appellant,

v.

Robert L. STRYKER; Stryker Realty, Inc.;
I. E. Shahan; Wendel Owen and Owen &
Associates, Inc., Defendants-Apellees.

No. 763.

Court of Appeals of New Mexico.

July 7, 1972.

Certiorari Denied Aug. 4, 1972.

Quincy D. Adams, Adams & Foley, Albuquerque, for appellant.

Russell Moore and Dennis M. McCary, Keleher & McLeod, Albuquerque, for appellees Stryker and Stryker Realty.

T. K. Campbell, Las Cruces, for appellees Shahan, Owen and Owen & Associates, Inc.

## OPINION

SUTIN, Judge.

Barber's Super Markets, Inc., in Count I, sought damages arising out of an alleged conspiracy to defraud and breach of fiduciary duties by defendants. In Count II, Barber's sought damages in the alternative against Stryker for violation of fiduciary duties and for negligence, all in connection with the sale to Barber's of an 18 acre tract of land in Las Cruces, New

Mexico, hereinafter called the Chisholm tract.

At the close of Barber's evidence, the trial court held that Barber's was not entitled to jury trial on Count I. It assumed jurisdiction as trier of the facts. Thereafter, the court made findings of fact and conclusions of law and entered judgment for defendants. On Count II, the trial court directed a verdict for defendant Stryker. From the order and judgment entered, Barber's appeals.

Barber's relies upon three claims of error: (1) denial of Barber's right to a jury trial on the issues raised by Count I of the second amended complaint; (2) dismissal of Count I of second amended complaint; (3) instructing a verdict in favor of Stryker on Count II of the second amended complaint.

We reverse.

### A. *Facts Most Favorable to Barber's*

Barber's was a corporation with its principal place of business in Albuquerque, New Mexico. J. C. Horn was its president and general manager. He had full authority to acquire real estate as a site for location of a supermarket.

Stryker Realty, Inc., was a licensed real estate broker with offices in Las Cruces, New Mexico. Robert L. Stryker was its qualifying broker. It was owned by Stryker and it employed other real estate brokers and salesmen.

Wanda Hyatt was a licensed real estate broker with Pioneer Land Company in December, 1966. On February 13, 1967, she obtained a broker's license and became associated with and employed by Stryker until May, 1968. With reference to the property involved in this case, Hyatt was instructed to present offers to Stryker because Stryker could better handle them.

Shahan was a licensed real estate salesman employed by Stryker from October 18, 1966, to and through April 30, 1967, but Shahan's license remained in Stryker's office from October, 1966 to December 31, 1967. Stryker did not surrender Shahan's

license for cancellation prior to December 31, 1967, as required by § 67–24–28(E), N.M.S.A.1953 (Repl.Vol. 10, pt. 1, Supp. 1971). On December 29, 1967, Stryker mailed the Shahan license to the Real Estate Commission and advised them that Shahan was no longer associated with his office.

To avoid confusion, defendants Owen and Owen & Associates, Inc. are included when reference is made to "Shahan." See Barber's Super Markets, Inc. v. Stryker, 81 N.M. 227, 465 P.2d 284 (1970).

The property involved consisted of approximately 18 acres of vacant land in Las Cruces originally owned by Chisholm, Inc. On August 25, 1967, it agreed to sell the property to Shahan for $150,000.00. On October 27, 1967, Barber's agreed to purchase the property from Shahan for $275,000.00.

Under Count I, Barber's claimed, (1) that the defendants and each of them did conspire with one another to perpetrate a fraud on Barber's and did in fact perpetrate a fraud; (2) that Shahan and Stryker breached their fiduciary duties toward Barber's; (3) Barber's suffered damages in the sum of $125,000.00.

We recite the background picture in order to lead to the vital issues in this case.

In December, 1966, Hyatt visited Horn in Albuquerque to discuss the sale and purchase of property in Las Cruces. Horn told Hyatt he was definitely interested in a site to build a retail supermarket. In February, 1967, Hyatt, then associated with Stryker, told Stryker that Barber's was interested in locating a store in Las Cruces. Hyatt and Stryker agreed to see if they could, with all speed, interest Barber's in a location in Las Cruces. Stryker told Hyatt if she secured a written offer on the property from Barber's, he would submit the offer to Chisholm.

Late in March and early in April, 1967, Hyatt wrote letters to Horn on Stryker stationery, made telephone calls, sent him maps, plats and other material, including maps of the Chisholm tract. In April,

1967, Hyatt requested Horn to come to Las Cruces to look at some locations. Horn came down and looked at a number of locations, including the Chisholm tract. Horn told Hyatt his first choice was *four and one-half acres* of the Chisholm tract, and asked her to get a price. She agreed to do this. *Horn was not then interested in buying* 18 *acres*. Horn said the negotiations went on from there with Hyatt, until the deal was closed in September. During this interim, a zoning problem was involved and Hyatt offered to try to get it changed. At Horn's request, she got a traffic count and the cost of fill dirt for the tract.

Later, there were a number of telephone conversations and another visit or two by Horn to Las Cruces, but he could not get a firm price on the four and one-half acres. Horn did not request Hyatt to bring him a contract, but he tried to get some kind of deal on the property. Finally, in July or August, 1967, he met with Stryker who said he would see if he could help Mrs. Hyatt to get a deal on the property. Horn did receive three or four price quotations from Hyatt and Stryker on the four and one-half acres, each of which kept going up. Hyatt said the owner was hard to deal with.

Neither Hyatt nor Stryker ever told Mrs. Chisholm that Barber's was interested in buying the four and one-half acres before she sold the 18 acre tract to Shahan. If Mrs. Chisholm had been told during May and June, 1967, that Barber's was interested in a store location, she would have attempted to sell the tract to Barber's. Neither Hyatt nor Stryker had a listing on this property, and never secured a written offer from Barber's.

It should be noted that between April, 1967 and September, 1967, Barber's was interested solely in a 4½ acre portion of the tract, not the 18 acre tract, and it was not interested in the name of the owner. Inasmuch as a 4½ acre tract was not purchased by Shahan nor sold by Shahan to Barber's, no claim for damages can arise under Count I with respect to the 4½ acre tract.

Horn did not meet Shahan until September 23 or 24, 1967, a month or so before Barber's agreed to purchase the property. He did not know that Shahan had ever been employed as a real estate salesman by Stryker, nor know that the property was owned by Chisholm, Inc., but it was immaterial to him who owned the property.

Before September 22, 1967, Horn did not ask Stryker to go to the owner to get a price on the 18 acre tract. But on September 22, 1967, he did. Stryker got in touch with Shahan, obtained the price of $275,-000.00 and relayed the price to Horn. Horn agreed with the price. Shahan knew that Barber's was interested in this property before September 22, 1967.

During the trial, Stryker was asked this question to which he made this answer:

Q. Before you went to ask Mr. Shahan what price he would sell for, did you ask Mrs. Hyatt to get some earnest money from Barbers [sic]?

A. No, sir, *because Mr. Horn had definitely given me instructions personally to try to procure that tract for Barbers [sic] Super Markets.* [Emphasis added].

On September 24 or 25, Horn came to Las Cruces to try to complete the deal on the property. He met with Shahan, Stryker, and Hyatt. Stryker introduced Horn to Shahan. Mr. Horn said, "my dealing at that time was with Shahan because he had been introduced as the owner of the property and that was what I was concentrating on, was closing the deal." Shahan told Horn he could not sell the property for six months because of a tax problem. Horn suggested a lease with an option to purchase. Shahan agreed. The subject matter was submitted to attorneys to prepare the necessary documents, and the transaction would be completed as soon as the lease-purchase arrangement was worked out. The papers were completed and signed on October 27, 1967.

During the month of October, the time of the preparation of the papers, Stryker followed the instructions of Barber's at-

torney in closing the deal. He had numerous telephone conversations with Barber's attorney, correspondence, and on at least one occasion he stopped in the attorney's office in Albuquerque. Barber's put the first month's rent of $2,000.00 and a $10,000.00 option fee in Stryker's hands which he held in his trust account until the matter was ready to be closed. The lease and option agreement, and copies thereof, were mailed to Stryker. Stryker obtained signatures and returned the papers. On October 31, 1967, Stryker was authorized to release the rent and option money to Shahan.

At no time did Shahan or Stryker inform Horn, (1) that Shahan had been a real estate salesman in Stryker's office; (2) that Shahan's license remained in Stryker's office during the negotiations and up past the closing of the deal; (3) that Stryker was acting as a broker for Shahan; (4) that Shahan agreed to purchase the property from Chisholm in August, 1967, at a price of $150,000.00; (5) that Stryker had attempted to negotiate a lesser price from Shahan for the property; (6) what the market value of the property was; (7) nor disclose any other facts or circumstances, acts or conduct which duty a broker owes to a principal.

Stryker had no oral or written agreement with Barber's for a real estate commission, but Shahan agreed to pay Stryker a 5% commission before Shahan met Horn at the airport in September, 1967.

Stryker earned a commission from Shahan, but he had not yet received a commission on this transaction. Hyatt earned a commission of $6,706.00 on the Shahan-Chisholm transaction, but did not receive it. Stryker never paid her a commission on the Shahan-Chisholm transaction or on the Shahan-Barber's transaction.

B. *Barber's was Entitled to a Jury Trial on the Issues Raised by Count I of the Second Amended Complaint.*

At the close of plaintiff's evidence, defendants moved for a directed verdict on

Count I. The trial court advised it would grant the motion, but, instead, it ruled that Barber's was not entitled to a jury trial. The trial court then made findings of fact and conclusions of law, and entered judgment for the defendants.

If Barber's was entitled to trial by jury, the trial court would have directed a verdict. If the trial court directed a verdict, on appeal, we would be governed by the rules set forth in Simon v. Akin, 79 N.M. 689, 448 P.2d 795 (1968).

■ However, where a case is tried to a court and the trial court makes findings of fact and conclusions of law, our approach to an opinion is different. We cannot reverse unless we are convinced that the findings cannot be sustained by evidence or inferences therefrom. Hoskins v. Albuquerque Bus Company, 72 N.M. 217, 382 P.2d 700 (1963).

The difference is obvious between our approach to a directed verdict and our approach to findings made by a trial court.

We have set forth the evidence most favorable to Barber's because we believe Barber's was entitled to a jury trial.

On June 7, 1968, Barber's original complaint in one count was filed to establish a trust for the benefit of Barber's, an equitable claim. On July 15, 1968, *Stryker* filed a jury demand and Barber's moved to strike it. On January 17, 1969, Barber's filed in open court an amended complaint in two counts, (1) to establish a trust for the benefit of Barber's, and (2) for damages against Stryker. On January 28, 1969, *Barber's* filed a demand for jury trial on the issues raised by *Count II* of the amended complaint. Stryker moved to strike the jury demand, and on February 10, 1969, he filed an answer to the amended complaint. This demand for jury was timely filed.

On November 23, 1970, Barber's filed a second amended complaint in two counts, (1) seeking damages against all defendants because the equitable relief previously demanded became moot; (2) as an alternative to Count I, Barber's in Count II sought

damages against Stryker. On November 25, 1970, *Barber's* filed a demand for jury trial of the issues raised by *Count I* of the second amended complaint. This demand was timely filed.

On December 2, 1970, Shahan moved to strike the demand for jury as to Count I because Count I was equitable in nature and the demand for jury trial was not timely filed.

On December 23, 1970, the trial court denied the motions of Stryker and Shahan to strike jury demands, and stated "the plaintiff is allowed a trial by jury of the issues raised by both Count I and Count II of the Second Amended Complaint." On January 12, 1971, this trial judge's designation was vacated. On March 1, 1971, the case came on for trial before a different trial judge.

On March 3, 1971, at the close of Barber's evidence, the presiding trial judge denied Barber's right to a jury trial on Count I. We believe this was error.

Rule 38(b) [§ 21–1–1(38)(b), N.M.S.A. 1953 (Repl.Vol. 4)] reads in part as follows:

> Any party may demand a trial by jury * * * by serving upon the other parties a demand therefor in writing at any time after the commencement of the action and not later than 10 days after the service of the last pleading directed to such issue * * *.

Under this rule, when a party amends his pleading so as to create jury issues, he is entitled to a jury trial upon timely demand. Griego v. Roybal, 79 N.M. 273, 442 P.2d 585 (1968). This rule also applies where a claim is completely changed from an equitable proceeding to one at law. Pugh v. Tidwell, 52 N.M. 386, 199 P.2d 1001 (1948). Count I of the second amended complaint is legal in nature, not equitable. Timely demand was made for the trial by jury, and Barber's was entitled to trial by jury as of right.

The trial court erred in denying Barber's right to trial by jury at the close of Barber's evidence. We disregard the findings of fact and conclusions of law made by the trial court under Count I.

C. *Shahan and Stryker were not Entitled to a Directed Verdict on Count I.*

Under Count I, the trial court held as a matter of law, (1) there was no evidence of conspiracy to perpetrate a fraud on Barber's; (2) Stryker was a "middleman"; (3) no fiduciary relationship was created between Barber's and Stryker.

We believe the trial court erred.

(1) *There was Sufficient Evidence to Create an Issue of Fact on Barber's' Claim of Fraud.*

Barber's claim for relief alleged the defendants conspired to and did in fact perpetrate a fraud on Barber's. We are not concerned with the claimed conspiracy because a civil conspiracy is not of itself actionable. The gist of the action is the damage arising from the acts done pursuant to the conspiracy. Armijo v. National Surety Corp., 58 N.M. 166, 268 P.2d 339 (1954).

An issue of fact exists on the claim of fraud if the facts are sufficient to create an issue as to constructive fraud. In re Trigg, 46 N.M. 96, 121 P.2d 152 (1942). Generally speaking, constructive fraud is a breach of a legal or equitable duty which the law declares fraudulent because of its tendency to deceive others. Such fraud may be present on the part of the fraud feasor without any showing of dishonesty of purpose or intent to deceive. Snell v. Cornehl, 81 N.M. 248, 406 P.2d 94 (1970); In re Trigg, supra; Scudder v. Hart, 45 N.M. 76, 110 P.2d 536 (1941). An action for constructive fraud is maintainable where there is a nondisclosure of material facts and the person charged with the constructive fraud had a duty to speak under existing circumstances. Everett v. Gilliland, 47 N.M. 269, 141 P.2d 326 (1943); see Snell v. Cornehl, supra.

Barber's claim of fraud is based on the nondisclosure of facts itemized previously in this opinion. These show a factual

issue as to such nondisclosure. The facts, previously reviewed, also show that Shahan agreed to pay Stryker a 5% commission. From this fact a permissible inference can be drawn that the agreement for a commission was an inducement to Stryker to bring about the sale to Barber's and that Stryker was an agent of Shahan in connection with the sale.

At this point, the inquiry is the relationship between Barber's and Stryker. State Trust & Savings Bank v. Hermosa Land & Cattle Co., 30 N.M. 566, 240 P. 469 (1925) will or will not be applicable dependent on that relationship. That case involved "double-dealing" on the part of the agent because the seller gave the buyer's agent $10,000 as an inducement to bring about the sale. Our Supreme Court said:

There is no more effective means of committing a fraud in a case of this kind than to corrupt the buyer's agent. The buyer relies upon the judgment and watchful care of his agent to protect his interests. In the transaction of purchase and sale, each party seeks a bargain. An agent cannot serve both parties, because in serving one he betrays the other. Mr. Wigmore [buyer] had a right to expect fidelity. Hamilton [his agent] had no right to sell it, nor Col. Hopewell [seller] to buy it. * * *

The authorities leave no doubt that a surreptitious dealing between one principal and the agent of the other is a constructive fraud on the latter which courts will not countenance. [Citing cases].

\* \* \* \* \* \*

It has been said many times that, in case of such constructive fraud as we have here in question, the wronged principal may rescind, or if he choose to ratify, may have such other relief as equity affords. [Citing cases]. And in many cases recovery of damages has been allowed. [Citing cases]. *Actions will lie against both the corrupted agent and the corrupting principal.* [Citing cases]. *It is immaterial whether the bribe actually induce disloyalty of the agent to his principal.* [Citing cases]. [Emphasis added].

\* \* \* \* \* \*

We therefore hold that, upon the establishment of the constructive fraud, the requisite element of good faith disappears. The language in question becomes a representation rather than an estimate, and defendant may recoup for any shortage which it can establish.

Under the above quoted case, both Stryker and Shahan may be held liable because of their agency relationship without regard to any employer-employee relationship. Their liability, however, depends on Stryker's relationship with Barber's. That relationship will be discussed in the next two points. In that discussion, we hold that factual issues existed concerning a broker relationship.

With that result, the trial court erred when it ruled there were no factual issues concerning the claim of fraud.

(2) *An Issue of Fact Exists Whether Stryker was a Middleman.*

Stryker's main contention is that he was a "middleman." Therefore, no fiduciary relation existed between Barber's and Stryker. 57 C.J.S. Middleman p. 1078; and Batson v. Strehlow, 68 Cal.2d 662, 68 Cal. Rptr. 589, 441 P.2d 101 (1968), are relied on.

The only case in New Mexico on the issue of a "middleman" is Ross v. Carr, 15 N.M. 17, 103 P. 307 (1909). Ross sought to recover a commission on the sale of timberlands by Carr to third parties. Ross had solicited the aid of another real estate broker named Wirtz in Milwaukee, Wisconsin, to try and find purchasers for the timberlands, and Carr gave Ross a letter agreeing to pay him a commission of 5% of any sale made with Wirtz and his associates. The land was sold to associates of Wirtz, but Wirtz acquired no interest in the property. Ross recovered his commission. In affirming, the court said:

A full examination of the record shows that in effecting the sale Ross did not act as a broker, but only as a middeman.

188

He was instrumental in bringing the buyers and sellers together, but was not expected to and did not take any part in the negotiations between them, and the final bargain was made without his aid or intervention. Indeed, it is in evidence that Ross did not know the price at which the land was sold until the written contract was offered in evidence. Ross, being only a middleman, could therefore legally have taken a commission from both buyers and sellers. McLure v. Luke, 154 F. 647 [1907]; Knauss v. Godfried Krueger Brewing Co., 142 N.Y. 70, 36 N.E. 867 [1894].

 *McLure* and *Knauss*, supra, support the contention that the real estate agent, to be a "middleman," must be employed for the mere purpose of bringing the possible buyer and seller together so that they may negotiate their own contract. The agent has only limited authority. He has no power to and does not negotiate the terms on which the principals will deal. However, he is no longer a "middleman" if he is invested with the least discretion in the matter of advising or negotiating the sale or purchase of property, or where the principal has the right to rely on the broker for the benefit of his skill or judgment, or in any such case where the agent is employed by the other side in a similar capacity, or in one where, by possibility, his duty and his interest might clash. "The whole matter depends upon the character of his employment," because the duty of an agent for the vendor is to sell property at the highest price, and the duty of an agent for the purchaser is to buy it at the lowest. If the agent is a "middleman," no fiduciary relation to either principal exists. Batson v. Strehlow, supra.

The facts heretofore set out would sustain a determination that Stryker was employed by Barber's to try to procure the Chisholm tract from Shahan. He was also employed by Shahan to sell the tract. He brought Shahan and Horn together. Horn concentrated on closing the deal himself, and they orally closed the deal. Before the deal was closed, Stryker obtained a price for Barber's. After the deal was closed, Stryker aided and assisted Barber's and acted as its trustee. From all of the evidence in the record we believe an issue of fact exists whether Stryker was a "middleman," whether he "was not expected to and did not take any part in the negotiations between them, and the final bargain was made without his aid or intervention."

Stryker was not a "middleman" as a matter of law. The trial court erred in so holding.

(3) *An issue of Fact Exists Whether a Fiduciary Relationship was Created Between Barber's and Stryker.*

 The evidence referred to in the preceding point on the subject of the "middleman" raises a factual issue as to whether Stryker was acting as Barber's agent in procuring the property for Barber's. If he was an agent, or broker, for Barber's a fiduciary relationship existed between Barber's and Stryker. Iriart v. Johnson, 75 N.M. 745, 411 P.2d 226 (1965); Mitchell v. Allison, 51 N.M. 315, 183 P.2d 847 (1947). Specifically, an issue of fact exists as to Stryker's status as an agent or a middleman, and those issues are to be resolved by the jury.

(4) *It is not Necessary to Decide Shahan's Status as an Employee of Stryker.*

The parties have argued two points, (1) the status of Shahan as an employee of Stryker. The argument has been whether the ruling by our Supreme Court in Barber's Super Markets, Inc. v. Stryker, supra, becomes the law of the case. As to this, see Gruschus v. C. R. Davis Contracting Company, 77 N.M. 614, 426 P.2d 589 (1967); (2) the effect of the failure to surrender Shahan's license during the time that Shahan had removed himself from the Stryker firm. We note that § 67–24–28(E), supra, places the duty to surrender the license upon the broker, not the salesman; upon Stryker and not Shahan.

 It is not necessary to decide these contentions. We have previously

pointed out that where there is a duty of disclosure, both Stryker and Shahan could be liable for constructive fraud, based on nondisclosure of material facts. The duty of disclosure depends upon Stryker's relationship to Barber's. If Stryker was an agent, and not a middleman, he may be held liable for his nondisclosure. If Shahan had knowledge of Stryker's relationship with Barber's as an agent, and nevertheless hired him, he may also be liable to Barber's regardless of whether he was Stryker's employee. State Trust & Savings Bank v. Hermosa Land & Cattle Co., supra.

On Count I, we hold that the trial court erred. Barber's is entitled to a new trial because, (1) Barber's was entitled to a jury trial; (2) factual issues exist as to constructive fraud; (3) factual issues exist whether Stryker was an agent or a middleman.

D. *Stryker was not Entitled to a Directed Verdict on Count II.*

Count II of Barber's Claim for relief is alternative to Count I. It seeks relief against Stryker for violation of fiduciary duties, but in addition thereto claims that Stryker failed to exercise reasonable care and diligence to purchase the property for Barber's upon the most advantageous terms for Barber's. Except for this claim of negligence, the allegations of Count II are substantially the same as those in Count I.

Heretofore, we have held that Barber's has a claim for relief against Stryker because issues of fact exist whether Stryker was an agent and whether he violated any fiduciary duties. We limit our opinion to the issue of negligence.

In Iriart v. Johnson, supra, the court said:

Neglect to communicate to his principal all facts which might influence the principal's action renders the broker liable to his principal.

From the "Facts Most Favorable to Barber's," supra, we believe an issue of fact exists whether Stryker exercised reason-able care and diligence in communicating to Barber's all facts which might influence Barber's with reference to the earlier negotiations for the 4½ acre tract and the 18 acre tract.

On Count II, we hold that the trial court erred in directing a verdict.

We reverse and hold that Barber's is entitled to a new trial on Counts I and II of its complaint.

It is so ordered.

WOOD, C. J., and COWAN, J., concur.