John G. BURTON, Plaintiff-Respondent,

v.

PET, INCORPORATED, a corporation, Defendant-Appellant,

St. Louis Lithographing Company et al., Defendants.

No. 57168.

Supreme Court of Missouri, Division No. 1.

May 13, 1974.

Lon Hocker, St. Louis, and Raymond F. McNally, Jr., St. Louis, for respondent.

Lashly, Caruthers, Rava, Hyndman & Rutherford, John H. Lashly, Albert J. Stephan, Jr., St. Louis, for appellant.

SEILER, Judge.

Pet, Incorporated, a Delaware corporation (hereinafter referred to as Pet), purchased the business of St. Louis Lithographing Corporation, a Missouri corporation (hereinafter referred to as Litho) by exchanging 56,000 shares of Pet's stock, then selling at 44⅞ per share, for all the outstanding stock in Litho. The controversy is whether plaintiff, John G. Burton, who was in the business of finding buyers for and negotiating the sale of businesses, was entitled to a fee on the sale. Burton sued Pet, Litho, and the four individual defendants who owned the capital stock of Litho, claiming he was entitled to a fee of $105,000. Specifically, Burton alleged that Litho and the individual defendants orally employed him to procure a buyer. As to Pet, Burton alleged that in consideration of his agreement to limit his activities in finding another competing purchaser, defendant Pet promised that if they purchased Litho, they would see that he was paid his fee, and that, with the knowledge and consent of Litho and the individual defendants, he did so limit his activities.

Trial before a jury resulted in a verdict in favor of Litho and the individual defendants and against Pet, with plaintiff's damages being assessed at $45,000 plus interest. No appeal was taken by plaintiff as to Litho or the individual defendants, but Pet appealed from the adverse judgment against it. On appeal, as at trial, Pet contends the contract between Burton and Pet was against public policy because it called for Burton to violate the duty he

owed Litho and that the agreement being void, the law should leave the parties where it found them and deny any recovery to plaintiff. Plaintiff responds that the contract was not against public policy, but that even if it were, plaintiff is entitled to recover because the parties were not in pari delicto.

We are of the opinion that plaintiff's own evidence, as set forth below, shows that he cannot recover and that the court should have sustained Pet's motion for a directed verdict at the close of the case.

Looking only to plaintiff's case and disregarding the contrary testimony from the defendants, these facts appear: Since 1948, plaintiff had been in the business of negotiating sales and mergers of businesses. His office was in St. Louis. In August 1967, Ralph Thomsen, president of Litho, talked to plaintiff about selling the company. Litho was considered a specialty company. It specialized in making liquor and wine labels for bottlers and distillers. The business was well established, made a good profit, and the stock was closely held.[1] Plaintiff expressed the opinion, after examining financial statements, that the company should bring between two and two and a half million dollars on an exchange of stock basis, with the possibility of an arrangement for additional compensation after the sale, if the earnings of the business increased in the first four or five years after the acquisition. Plaintiff also informed Thomsen of his fee schedule.

No definite employment was agreed upon at this first meeting, but thereafter plaintiff wrote various corporations, saying he was in touch with a company which might be of interest and describing in general terms Litho's specialty, annual sales, net profits, stock ownership, and stating an asking price. One of the first companies plaintiff talked with was Pet. This was on November 21, 1968 at Pet's St. Louis headquarters. Pet's response, however, was negative and plaintiff had no further contact with Pet until events described later herein.

One company which showed strong interest was Bemis Company of Minneapolis, Minnesota (hereinafter referred to as Bemis) and Thomsen gave written authorization for plaintiff to represent Litho in the Bemis negotiations. Plaintiff testified he had some 15 to 20 contacts with the Bemis people on behalf of Litho.

On April 29, 1969, the Bemis vice-president called plaintiff to make arrangements to meet with Thomsen. Plaintiff arranged a meeting in St. Louis for May 12, 1969. He suggested to Thomsen that they get together to "review the procedure" before the Bemis people arrived and also furnished Thomsen with figures as to net sales, net profits and earnings per share on Bemis for the first quarter of 1969. While plaintiff did not know what Bemis was prepared to pay for Litho, he testified he had been talking price with them and they were coming to St. Louis knowing that the asking price for Litho was between three and a quarter to three and a half million dollars. It was plaintiff's expectation that the May 12 meeting would result in the "two boss men" shaking hands on an agreement, which in his usual experience, meant that the deal would close.

In the course of two or three telephone calls with Thomsen about this time, plaintiff was told by Thomsen that "Pet was very, very hot at that moment", that the Litho people were much interested in making a deal and he (Thomsen) was anxious to get Bemis to St. Louis if Bemis was interested. Plaintiff told him about the May 12 meeting. Plaintiff testified that Thomsen told him to "stay away from Pet", that he (Thomsen) was handling that and would keep plaintiff informed.

Plaintiff instead, however, telephoned the person at Pet to whom he had talked in his original contact with Pet on November

---

1. Thomsen and two other officers of the company owned approximately 98 percent of the Litho stock. The remaining 2 percent was owned by Litho's star salesman

21, 1968, reminded him about it, and that if Pet made a deal he expected a finder's fee. Plaintiff confirmed this by letter, reiterating that he brought Litho to Pet, that in the meantime he had been trying to place Litho elsewhere, and that in case Pet acquired Litho he wanted a reserve set up in the closing contracts to cover his fee. On cross-examination, plaintiff testified he had no conversation with Pet since his original contact of November 21, 1968, had done nothing about selling Litho to Pet in the interim and that the Pet-Litho negotiations were getting "hotter and hotter" without him.

Two days later, on May 1, 1969, plaintiff had a telephone call from Richard S. Jones, senior vice-president of Pet and a former practicing lawyer. Jones and plaintiff were long time friends and frequently lunched at the same table at a luncheon club. Plaintiff gave the following testimony in relating the telephone conversion:

"When he called he said, 'Jack, we have got your letter,' and he said that, 'We are in deep negotiations,' and he said 'We recognize you in this particular deal. We also know you have got another contact,' and I said 'Yes', and he said, 'Can you hold him off?' I said, 'He will be down here on the 12th, and if you can get your homework'—or some remark made like that I made—'done, get the deal wrapped up by then. That is the situation.' He said, 'Okay, I will get to work' and I did not do anything from then on."

On cross-examination as to what his attitude toward contacting Bemis would have been had Pet not agreed to pay him a fee, plaintiff said:

"A. If Jones had called up and said, 'I am not paying you any fee . . . or something like this . . . I would certainly have had a lot different attitude toward the Bemis Company. I'd have gotten them down here and gotten them going a lot faster.

"Q. Do you think you could have closed that deal in five days?

"A. I would have done a lot more than I did . . . I know I would have tried."

The next day, May 2, 1969, Thomsen called plaintiff to see when they would meet in advance of the scheduled meeting with Bemis. Plaintiff dictated an office memo about this telephone conversation as follows:

"On May 2nd at 2:15 PM, Ralph Thomsen called to find out when I want to see him about the meeting with Bemis when they come to St. Louis. He was under the impression that they were coming this week but I told him he had apparently not read my letter correctly as they are not coming until Monday, the 12th.

He received a copy of my April 29th letter to Bemis and I also wrote a note to him, stating that they would be here on the 12th but I assume the pressure has been put on him by Pet, Inc. for a meeting next week and he wanted to hold them off until we have had a meeting with Bemis. He told me he did not want to play one against the other.

Apparently, he is not aware of my arrangement with Pet, Inc.

JOHN G. BURTON"

There is no evidence in the record that Thomsen or anyone at Litho knew of the arrangement by Pet to pay plaintiff a commission. Plaintiff testified in accord with this, saying in response to the question, "Did you tell Mr. Thomsen, Mr. Burton, that you had an understanding with Pet through Mr. Jones that you wouldn't pursue Bemis any more until May 12?", "I did not. No." Nor did plaintiff get any aid on this from defendants' side of the case. Thomsen, president of Litho, testified he knew nothing of the Burton-Pet arrangement and did not authorize plaintiff to limit his activities with Bemis;

Jones, vice-president of Pet, said he did not disclose the arrangement to Litho.

Plaintiff testified there was an error in the second paragraph of the above memorandum, that "What I meant to say here was the opposite. My secretary made the error, got the Bemis and Pet crossed here . . ." Plaintiff did not elaborate on this.

Some way Bemis learned that Pet was about to make a deal with Litho and notified plaintiff that they were postponing the May 12th meeting until it was clarified whether Litho was going to make a deal elsewhere.

On May 7, 1969, Litho and Pet entered into a memorandum agreement whereby Pet was to acquire all the stock and assets of Litho for 56,000 shares of the common stock of Pet. The transaction was completed on May 26, 1969 and at the current price of Pet stock on the New York Stock Exchange amounted to $2,513,000.

Plaintiff testified he had some "feel" as to what the price would be had Bemis bought Litho; that it would "go" somewhere between two and three-quarters to three million dollars; that he was going to propose two and a half million to be paid right away with a bonus arrangement coming out of future earnings if generated as projected, "which would run the final price up to around three million dollars"; that if these suggestions could be worked out, it would have been more than Litho got from Pet.

In the first part of June 1969, plaintiff and Jones met to discuss plaintiff's fee and agreed on an amount, subject to approval by Jones' associates. Plaintiff asked Jones to confirm this by letter, which Jones did with the following:

"Dear Jack:

This will confirm our discussion yesterday as to the fee which you should receive from us in connection with our ac-quisition of St. Louis Lithographing Company.

Since you had done considerable work over a period of several years, and had a buyer at a potentially higher price which you were able to discourage during our negotiations, we agreed we owed a fee. You and I agreed on a compromise fee of $80,000, which is tentative until agreed to by my associates. I shall obtain their reaction as soon as they return from a business trip."

Jones' associates at Pet refused to authorize $80,000, but agreed to pay $50,000, which plaintiff rejected and the present action followed. Plaintiff denied telling Jones that he had a buyer at a potentially higher price which plaintiff was able to discourage during the Pet negotiations. Plaintiff said those were Jones' words, not his; that Jones wrote the letter, not plaintiff.

On the legal issues, we first note the difference in plaintiff's claims against Litho on one hand and Pet on the other. As to Litho and its individual stockholders, plaintiff took the position by the allegations in his petition and by the instruction on which he submitted the case against Litho, that plaintiff was Litho's agent to find a buyer and that he was the procuring cause of the sale to Pet and for that reason Litho owed him a fee. Under this pleading and submission, plaintiff was Litho's agent.

As to Pet, a prospective purchaser of Litho, plaintiff's claim was much different. It was based on the allegations contained in the petition and faithfully tracked in the instruction by which plaintiff submitted him claim against Pet, that in consideration of plaintiff's agreement to limit, during Pet's negotiations, his activities in finding a competing purchaser for Litho, Pet, on or about May 1, 1969, agreed that if Pet purchased Litho, Pet would see that plaintiff was paid a fee and plaintiff did so limit his activities, but Pet refused to pay.

Plaintiff also alleged in his petition that his limiting of his activities was with the knowledge and consent of Litho. No such proposition was submitted to the jury, however, nor could it have been, because as seen from the facts, the evidence was undisputed that plaintiff did not inform Litho of his agreement with Pet and that Litho did not know of it.

■ It is a well-settled rule of law that an agent employed to negotiate a sale, purchase or exchange of property may not make a contract for compensation with the other party to the transaction. Annot. Agency—Compensation from Third Person, 14 A.L.R. 464. An agent is subject to a duty to his principal not to act on behalf of an adverse party in a transaction connected with his agency without the principal's knowledge. Restatement of Agency 2nd, Sec. 391, p. 212. ". . . There is scarcely a rule of law which has received more uniform approval than that an agent cannot serve the opposing party without the knowledge and consent of his principal. The law, recognizing that, in general, human nature is too weak to assure faithful service in such circumstances, has absolutely forbidden such dual position, and, if it be taken, the agent is denied any redress . . ." Winter v. Carey, 127 Mo.App. 601, 106 S.W. 539 (1907).

The case closest on the facts seems to be Rabinowitz v. Pizer, 108 N.Y.S. 994 (1908). Plaintiffs' petition there alleged that they were hired by Fred Schmonsees to procure a buyer for his premises at a one percent commission. Plaintiffs contacted defendant and offered Schmonsees' property for sale. Defendant requested plaintiffs not to interfere further in the matter and not to procure any other customer for the property, in exchange for which he would pay plaintiffs one percent of the price he paid for the property. After defendant purchased the property plaintiffs sued to recover the one percent commission. The New York court sustained a demurrer to the petition for the reason that the agreement attempted to be made was void as against public policy.

Atlee v. Fink, 75 Mo. 100 (1881) is an old case, but still good law. There defendant Fink agreed with plaintiffs' salesman, O'Sullivan, that defendant would receive a commission on sales of plaintiffs' lumber to Fink's employers through Fink's influence with them. Fink never informed his employers that he was to get a commission on lumber purchased by them from plaintiffs. In a suit by plaintiffs on account for lumber sold, Fink recovered on his counterclaim for his commission and plaintiffs appealed.

This court held that Fink could not recover because the commission contract was against public policy. The court said at l. c. 103: ". . . That agreement was a temptation to him to certify as correct, bills for lumber which might be incorrect, both as to the amount of lumber and prices charged. His compensation could be increased by such conduct, and it is no answer, that nothing of this kind occurred . . ."

■ In the case before us, Pet corresponds to Atlee, Burton to Fink, and Litho to Fink's employer. In return for a guarantee by Pet that it would see that his fee was paid, plaintiff was in a position where he could be tempted to wrong his employer, Litho, by refraining from pursuing the prospect, Bemis, until Pet had first had a chance to purchase Litho. It can never be known whether the Bemis deal, had it materialized, would have been at a higher price than that paid by Pet. What is known is that plaintiff admits that had Mr. Jones said Pet would not pay him a fee, plaintiff would have bestirred himself and gotten Bemis "going a lot faster" and would "have done a lot more" than he did.

Nor does the fact that Pet knew Burton was acting as a dual agent and was therefore not mislead by Burton's dual role, entitle Burton to recover from Pet. The reasoning behind this principle is set forth in

Mechem, Outlines of Agency, Sec. 502, p. 347 (4th Ed.1952). ". . . [I]f I knowingly induce or permit the agent of the other party to the transaction to enter into my service, I would ordinarily be doing that other party an injury . . . The guilty agent would also be implicated, and could ordinarily recover no compensation from either principal: Not from the first principal, because he had betrayed him, nor could he ordinarily recover from me, because both he and I were parties to an illegal contract. Even if I were innocent he would be guilty."

Plaintiff contends that even if his contract with Pet is against public policy, he should be allowed to recover because he is not in pari delicto with Pet. The cases on which plaintiff relies, while stating the general rule that there are instances where a party to an illegal contract who is not in pari delicto will not be denied relief, are distinguishable on the facts. In the case before us, plaintiff was not an innocent victim of a scheme to defraud in a footrace promotion, as in Hobbs v. Boatright, 195 Mo. 693, 93 S.W. 934 (1906), or a widow overreached by one on whom she was relying, as in Gardine v. Cottey, 360 Mo. 681, 230 S.W.2d 731 (banc 1950), or one coerced into entering an unlawful agreement under threat of foreclosure of his home, as in McAllister v. Drapeau, 14 Cal. 2d 102, 92 P.2d 911 (1939), or a shipper whose machinery was damaged by the negligent unloading of an unlicensed hauler, as in Graham v. Dean, 144 Tex. 61, 188 S. W.2d 372 (1945), or an investor who was relying on his confidential adviser, as in Judson v. Buckley, 130 F.2d 174 (2d Cir. 1942), cert. den. 317 U.S. 679, 63 S.Ct. 161, 87 L.Ed. 545. The plaintiff in the case at bar was not a bystander. Plaintiff was to hold off and that is what he did.

Plaintiff argues further that he is a layman who did not understand the meaning of the phrase "against public policy", while Jones ". . . has had a truly distinguished career in the legal profession as well as the closely aligned field of corporate acquisition . . ." and is a person to whom ". . . the phrase 'against public policy' and all its nuances are well understood . . ." Plaintiff argues that the agreement to restrict his activities was Pet's idea, that since Jones knew the agreement was against public policy he had a duty to disclose this fact to Burton, and that because of Jones' superior knowledge in this regard Burton should be allowed to recover.

Plaintiff had been in the business of working out the sale and merger of corporations since 1948. He described himself as having wide experience, with negotiations running into many millions annually. He must have known he owed a duty to act in his client's best interest. Any lay person would recognize that the Burton-Pet agreement put plaintiff in a questionable position as to his client, at best, and could see that the agreement was not in furtherance of Litho's best interest, but of plaintiff's. Plaintiff was looking out solely for his own interest in attempting to "insure" a commission on the sale of Litho to Pet and now is complaining because this "insurance" agreement is unenforceable.

Even if Jones should have and had told plaintiff the commission agreement was against public policy, plaintiff would be in no better position to recover against Pet than he is now. This because plaintiff's petition cites his promise to make no further efforts to advance the sale of Litho to Bemis as the only consideration for Pet's promise to pay him a commission. Had plaintiff known the commission agreement was against public policy he might not have made the promise to limit his activities, in which case there would have been no consideration for Pet's promise to pay a commission; or he might have gone ahead and made the promise anyway, despite knowledge. Either way, receipt of knowledge from Jones (accepting plaintiff's assertion he did not know the commission agreement

was against public policy), would not help plaintiff against Pet.

The judgment is reversed.

BARDGETT, P. J., and MORGAN, J., concur.

HOLMAN, J., not sitting.