PROPERTY HOUSE, INC., Plaintiff-Appellant/Cross-Appellee, *v.* ROY C. KELLEY, FORKEL PROPERTIES CO., a California corporation, and CINERAMA HAWAII HOTELS, INC., a Hawaii corporation, Defendants-Appellees/Cross-Appellants, and JOHN DOES I-V, and JOHN DOE CORPORATIONS VI-X, Defendants

NO. 10288

(CIVIL NO. 64344)

MARCH 13, 1986

LUM, C.J., NAKAMURA, PADGETT, HAYASHI, AND WAKATSUKI, JJ.

OPINION OF THE COURT BY HAYASHI, J.

This appeal concerns the attempt by Property House, Inc. (hereinafter "Property House") to collect real estate brokerage commissions from Roy C. Kelley, Forkel Properties Co., and Cinerama Hawaii Hotels, Inc. (hereinafter collectively the "sellers") in connection with two separate transactions. Property House, a licensed real estate broker, was owned by Paul K. Strauch, Jr. (hereinafter "Strauch"), the principal broker employed by Property House, and Hal C. Lundburg (hereinafter "Lundburg"), a real estate broker employed by Property House.

In Count I, dismissed by the trial court, Property House sought a commission for the unconsummated sale of four Waikiki hotels. In Count II, the trial court awarded Property House its commission for another unconsummated sale of two different Waikiki hotels. We reverse on both counts, and remand only Count I for a new trial.

I.

*As to Count I*

A.

On or about April 28, 1980, Roy C. Kelley (hereinafter "Roy Kelley")[1] transmitted to Hal C. Lundburg a letter in which Roy Kelley agreed to negotiate with Lundburg's unnamed prospective buyer for the sale of the Cinerama Reef, Cinerama Reef Towers, Edgewater, and Waikiki Tower hotels.[2] The letter specified a total cash price of $80,160,000 for the hotels, and provided that the deal would be void if the prospective buyer failed to consummate the purchase within thirty days. If the prospective buyer purchased the hotels, the sellers would pay Property House a commission of five per cent (5%) of the gross selling price.

---

[1]Roy Kelley was a general partner of Forkel Properties Co. (hereinafter "Forkel"), which owned the Cinerama Reef and Cinerama Reef Towers hotels, and chairman of the board of Hotel Operating Co. of Hawaii, Ltd., which owned the Waikiki Tower and Edgewater hotels. The trial court found that Roy Kelley had the authority to bind the corporations which owned the four hotels.

[2]The trial court concluded that this letter constituted an exclusive listing agreement.

On May 29, 1980, Roy Kelley, Lundburg, Strauch, Axel Ornelles, an attorney representing Fulcrum Capital Corporation (hereinafter "Fulcrum"), and Henry Martin, Vice President of Fulcrum, met and agreed upon the following terms of sale: the sales price of the four hotels would be $80,000,000 cash rather than the $80,160,000 figure specified in the listing agreement; Fulcrum, the prospective buyer, would have thirty days within which to submit a signed contract for the purchase of the hotels; Fulcrum would be provided with a reasonable time thereafter to complete financing of the purchase; Roy Kelley would renegotiate the applicable ground leases and retain possession of the penthouse apartment of the Waikiki Tower Hotel for a period of five years; and James Cotter, an attorney and general partner of Forkel, was to handle the mechanics of the purchase. These terms were reaffirmed at a second meeting held on June 3, 1980 and attended by Henry Martin, Strauch, James Cotter, and Robert DeGravelle, Fulcrum's president and sole shareholder.

Several days later, on June 11, 1980, Fulcrum submitted a Deposit Receipt, Offer and Acceptance (hereinafter "DROA") to Forkel embodying the terms agreed upon at the May 29 and June 3 meetings. Fulcrum attached a copy of a letter evidencing the interest of a lending institution in financing the purchase of the hotels, and a copy of a check evidencing a deposit on the sale of $1,000,000.

A letter dated June 13, 1980 from Axel Ornelles to Roy Kelley reiterated the agreed terms of sale. In response, Dr. Richard Kelley (hereinafter "Dr. Kelley"), Roy Kelley's son, informed Axel Ornelles in a letter dated June 20, 1980 that only officers of "Cinerama, Incorporated," and not Roy Kelley, had the authority to handle any transactions involving the hotels. Dr. Kelley stated that when William F. Forman, president of Cinerama, Incorporated, came to Honolulu, the "possibility of the sale" of the hotels would then be considered.

Soon thereafter, on or about July 9, 1980, Fulcrum received from an attorney representing Roy Kelley two letters of intent containing terms materially different from those previously agreed upon and formalized in the DROA submitted by Fulcrum. The letters of intent provided for the sale of the sellers' leasehold interest in two of the hotels for $72,016,000 and the sale of Forkel's option to acquire the leasehold interests in the other two hotels for $11,419,000. Then on or about July 24, 1980, Fulcrum received a second draft of one of the letters of intent. This draft, however, provided only for the sale of the leasehold interests

in the first two hotels, and specified the different price of $74,470,000.

Finally, in a letter dated August 27, 1980, Roy Kelley informed Lundburg that since the sellers had received "no bona fide offers" for the hotels, the hotels were no longer for sale and all pending negotiations had ceased.

## B.

The trial court made a finding (mislabeled a conclusion of law) that the sellers had "arbitrarily and wrongfully refused to accept the DROA" by engaging in a "protracted course of bad faith negotiation characterized by their unilaterally changing the terms and conditions of sale" as set forth in the April 28, 1980 listing agreement and modified at the May 29 and June 3 meetings. Record, Vol. VII at 63. The trial court found that this bad faith conduct caused the sale of the hotels to be terminated, thereby denying Property House the chance to earn its commission. Citing *Ikeoka v. Kong,* 47 Haw. 220, 386 P.2d 855 (1963), the trial court correctly concluded that the sellers could not defeat the right of Property House to its commission by their bad faith refusal to consummate the sale.

Nevertheless, the trial court denied Property House its commission on the ground that Property House had failed to show that either Fulcrum or its president was ready or able to finance the purchase of the four hotels. It concluded: "It is incumbent upon the plaintiff to make this showing before the claimed commission can be awarded." Record, Vol. VII at 65. We hold that the trial court erred in placing the burden on Property House to show the financial ability of the prospective buyer.

We find *Ikeoka v. Kong* dispositive of this issue. In *Ikeoka,* factually similar to the instant case, the defendant broker had entered into an employment agreement with the plaintiff seller which provided for a commission to be paid to the broker "upon any such sale being effected or contracted for." 47 Haw. at 221, 386 P.2d at 857. After the seller and a prospective buyer located by the broker had orally agreed to the terms and conditions of sale, an Agreement of Sale was drafted, executed by the prospective buyer, and delivered to the seller. The seller accepted earnest money from the prospective buyer, paying one-half of it to the broker as partial payment on his commission. The seller, however, subsequently refused to execute the Agreement of Sale unless it was modified. The buyer would not consent to the modification, and the sale

was never consummated. 47 Haw. at 222-24, 386 P.2d at 857-58.

We concluded in *Ikeoka* that the broker had accomplished all that he could under the employment agreement to earn the commission. 47 Haw. at 234-35, 386 P.2d at 863. We held that the refusal by the sellers to execute the Agreement of Sale and thereby complete the transaction was unreasonable and arbitrary. As a result, the sellers by their conduct were estopped from declaring that a sale had not been contracted for by the broker. 47 Haw. at 237, 386 P.2d at 864-65.

In particular, we recognized that although "it is true that in the ordinary suit to recover a commission the broker must establish the financial ability of the purchaser," this burden of proof as to financial ability shifts to the seller "where the seller accepts the purchaser and his offer and then prevents the consummation of the sale by his own default." 47 Haw. at 234, 386 P.2d at 863.

In the instant case, the sellers accepted Fulcrum and its offer when they agreed to the terms of sale reached at the May 29 and June 3 meetings, and received without objection the Fulcrum DROA embodying these terms. The subsequent bad faith of the sellers, preventing the sale from being consummated, caused the burden to shift to the sellers to show Fulcrum was not a ready, willing, and able buyer. The trial court, therefore, erred in requiring Property House to show the financial ability of the prospective buyer. Accordingly, we reverse the trial court's dismissal of Count I, and remand for reconsideration on the basis of the existing record[3] and entry of appropriate findings of fact, conclusions of law, and judgment in light of our holding.

## II.

### *As to Count II*

#### A.

On July 31, 1979, Property House and Roy Kelley entered into an exclusive listing agreement for the sale of the Coral Seas and Reef Lanai

---

[3]A new trial is not necessary because the trial was jury-waived, both parties had a full and fair opportunity to produce evidence on the financial ability issue, and the evidence produced was by way of deposition rather than live testimony so that the trial court's reliance upon the existing record would not be adversely affected by the passage of time.

hotels.[4] Under the terms of this agreement, Property House was to receive a commission of three and one-half per cent (3½%) of the sales price of the listed property "upon the purchase" by a "registered and qualified" buyer. The agreement was to terminate twelve months after the registration of the client with Roy Kelley. The asking price of each hotel was $3,000,000 cash.

Some time after receiving the exclusive listing, Property House entered into an agreement with Jay H. Shidler (hereinafter "Shidler") to represent him as a potential buyer of the hotels. In return, Property House was to receive an additional two and one-half per cent (2½%) commission of the sales price upon consummation of the sale.

In a letter dated August 21, 1979, Lundburg registered with Roy Kelley two prospective buyers, Shidler and Harrison Development Corporation, described as being interested in the purchase of either the Coral Seas Hotel or the Reef Lanai Hotel. That same day, Shidler submitted to Roy Kelley a signed DROA for the Coral Seas Hotel only. An initial deposit was to be made in the amount of $50,000, with the balance to be paid with $750,000 in cash and a $2,250,000 promissory note secured by a first mortgage. Roy Kelley did not accept this offer.

In a letter dated August 23, 1979, Roy Kelley acknowledged receipt of Shidler's offer but informed Lundburg that Dr. Kelley had "rejected all sales" due to "adverse tax consequences." The trial court found that both Kelleys had knowledge of the possible adverse tax consequences prior to the July 31, 1979 execution of the exclusive listing agreement.

Pursuant to a letter dated December 6, 1979, Shidler and James C. Reynolds, through their attorney, submitted an offer to Roy Kelley to purchase the Coral Seas Hotel for $3,000,000 cash, or to exchange the hotel for other property acceptable to Roy Kelley in a tax-free exchange. This letter offer provided that Roy Kelley would pay to Property House the commission specified in their listing agreement, even though Property House was neither involved with nor had any knowledge of the offer. Dr. Kelley rejected this offer, stating that the Coral Seas Hotel was no longer on the market.

Property House sought to collect its brokerage commission in Count II of its Complaint. The trial court awarded it $105,000 plus attorney's

---

[4] The trial court found that Roy Kelley had the authority to enter into a binding contract for the sale of the hotels, which were owned by Hotel Operating Co. of Hawaii, Ltd.

fees and costs.

### B.

The record shows Property House entered into an agreement with Roy Kelley to act as broker on his behalf in regard to the sale of the Coral Seas and Reef Lanai hotels, and later entered into a separate agreement with Shidler to act as broker on his behalf with respect to the purchase of the same hotels. While Shidler had knowledge of Property House's prior agreement with Roy Kelley, Roy Kelley neither had knowledge of nor consented to the dual agency. Property House made no attempt to disclose to Roy Kelley its separate agreement with Shidler. We hold that any right Property House may have had to collect a commission from the sellers is barred by its undisclosed dual representation of both parties.

The rules of agency apply to the relationship between a real estate broker and principal. *Miller v. Berkoski,* 297 N.W.2d 334, 338 (Iowa 1980). The law imposes upon a real estate broker a fiduciary obligation comprised of utmost good faith, integrity, honesty, and loyalty, as well as a duty of due care and diligence. *Rose v. Showalter,* 108 Idaho 631, 632, 701 P.2d 251, 252 (1985). In particular, a real estate agent bears a duty to make a full, fair, and timely disclosure to the principal of all facts within the agent's knowledge which are, or may be, material to the transaction and which might affect the principal's rights and interests or influence his actions. *Mersky v. Multiple Listing Bureau of Olympia, Inc.,* 73 Wash. 2d 225, 229, 437 P.2d 897, 899 (1968); *see also Sierra Pacific Industries v. Carter,* 104 Cal. App. 3d 579, 581, 163 Cal. Rptr. 764, 766 (1980). "Unless otherwise agreed, an agent is subject to a duty to use reasonable efforts to give his principal information which is relevant to affairs entrusted to him and which, as the agent has notice, the principal would desire to have . . . . " Restatement (Second) of Agency § 381, at 182 (1958).

In *Jenkins v. Wise,* 58 Haw. 592, 603, 574 P.2d 1337, 1344 (1978), we recognized the requirement that a principal must have knowledge of and consent to the purchase by a real estate agent of property which he has been authorized to sell, or else the transaction would be voidable by the principal. Similarly, in *Silva v. Bisbee,* 2 Haw. App. 188, 190, 628 P.2d 214, 216 (1981), the court recognized that, absent full disclosure to the client, it was a breach of fiduciary duty for a real estate broker to sell the client's property to a party in which the broker had a pecuniary interest.

A dual agency is therefore permissible only where the agent obtains

the consent of both principals after full disclosure. *Sierra Pacific Industries v. Carter,* 104 Cal. App. 3d at 581, 163 Cal. Rptr. at 766; *Burton v. Pet, Inc.,* 509 S.W.2d 95, 100 (Mo. 1974); *Hughes v. Miracle Ford, Inc.,* 676 S.W.2d 642, 645 (Tex. Ct. App. 1984); *Meerdink v. Krieger,* 15 Wash. App. 540, 544, 550 P.2d 42, 45 (1976). Section 391, Restatement (Second) of Agency (1958), entitled, "Acting for Adverse Party without Principal's Consent," provides: "Unless otherwise agreed, an agent is subject to a duty to his principal not to act on behalf of an adverse party in a transaction connected with his agency without the principal's knowledge." The underlying reason for the rule is the public policy to prevent fraudulent conduct. *Anderson v. Anderson,* 293 Minn. 209, 216, 197 N.W.2d 720, 724 (1972).

The breach of the duty of full disclosure by Property House deprives it of its right to a commission. *Sierra Pacific Industries v. Carter,* 104 Cal. App. 3d at 583, 163 Cal. Rptr. at 767.

> [W]here an agent representing both the seller and buyer negotiates a sale of land, the principal or employer ignorant of the double agency may at his election not only rescind the contract but also defeat the agent's right to receive or retain any compensation for his services . . . . These consequences follow even though the principal ignorant of the duplicitous agency cannot prove actual injury to himself or that the agent committed an intentional fraud.

*Anderson v. Anderson,* 293 Minn. at 216, 197 N.W.2d at 724 (citations omitted); *see also Stinson v. Teelin Real Estate, Inc.,* 370 So. 2d 1205, 1206 (Fla. Dist. Ct. App. 1979); *Rose v. Showalter,* 108 Idaho at 632, 701 P.2d at 252; *PMH Properties v. Nichols,* 263 N.W.2d 799, 802 (Minn. 1978); *Lawton v. McHale Realty Co.,* 85 R.I. 355, 358, 131 A.2d 679, 681 (1957).

C.

In the instant case, the trial court made a finding that the role of Property House was limited to locating a purchaser who would act in accordance with the sellers' specifications, and that Property House was not empowered to negotiate any terms or invested with any discretionary authority. The court concluded that Property House acted solely as a middleman and was not precluded from receiving compensation from both parties to the transaction.

A "finder" or "middleman" is one whose employment is limited to bringing parties together so that they may negotiate their own contract.

*Tyrone v. Kelley,* 9 Cal. 3d 1, 9, 507 P.2d 65, 70, 106 Cal. Rptr. 761, 766 (1973). He has no power to and does not negotiate the terms on which the principals deal. *Barber's Super Markets, Inc. v. Stryker,* 84 N.M. 181, 188, 500 P.2d 1304, 1311 (1972). He must not be invested with the least discretion in the matter of advising or negotiating the sale or purchase of property, and neither party must not have the right to rely on him for the benefit of his skill or judgment. *Id.* Unlike a broker, a middleman is "in no fiduciary relationship to his principal nor under any obligation not to receive compensation from the opposite party to the transaction." *Batson v. Strehlow,* 68 Cal. 2d 662, 669, 441 P.2d 101, 106, 68 Cal. Rptr. 589, 594 (1968) (quoting *King v. Reed,* 24 Cal. App. 229, 235, 141 P. 41, 48 (1914)). On the other hand, "a broker, in addition to the duties of a 'middleman,' is employed to use discretionary authority for the benefit of his employer and to act for his best interests." *Id.*

Even if Property House acted merely as a "middleman" in this transaction, we choose not to recognize a "middleman" exception to the real estate broker's duty of full disclosure. The disclosure and consent requirements, while certainly not burdensome, serve to reduce the risk of misconduct by an intermediary. By keeping all parties fully informed, they reduce the potential for misunderstanding and dispute.

HRS Chapter 467 (1976), providing for the licensing and regulation of real estate brokers and salesmen, exhibits a legislative intent to regulate even the activities of so-called "middlemen." HRS § 467-1(2) (1976) defines a real estate broker to include "any person, copartnership, or corporation, who for compensation or a valuable consideration, sells or offers to sell, buys or offers to buy, or negotiates the purchase or sale or exchange of real estate, or *lists,* or *solicits for prospective purchasers,* . . . any real estate . . . ." (Emphasis added.) Property House is not only a duly licensed real estate broker, but by entering into the exclusive listing agreement and by soliciting purchasers, it in fact acted as a real estate broker in this transaction.

Although HRS § 467-14(4) (Supp. 1984) does not confer a private right of action whereby a party may refuse to pay a commission to a broker in violation thereof, *Wick Realty, Inc. v. Napili Sands Maui Corp.,* 1 Haw. App. 448, 454, 620 P.2d 750, 754 (1980), it reflects the public policy of this state:

§ *467-14 Revocation and suspension of licenses.* The real estate commission may revoke any license issued hereunder, or suspend the right of the licensee to use the license, for any of the

following causes:

. . . .

(4) Without first having obtained the written consent so to do of both parties involved in any real estate transaction, acting for both the parties in connection with the transaction, or collecting or attempting to collect commissions or other compensation for his services from both of such parties . . . .

A plain reading of HRS § 467-14(4) indicates no exception for transactions in which a real estate broker acts purely as a middleman. Nor is there any evidence, as there was in *Tyrone v. Kelley,* 9 Cal. 3d 1, 507 P.2d 65, 106 Cal. Rptr. 761 (1973), that the legislature intended to exempt licensed real estate brokers acting merely as middlemen from the purview of the real estate licensing laws.

Property House owed a duty to Roy Kelley to disclose its dual representation. Its failure to do so deprives it of its right to compensation from the sellers. We reverse the trial court's judgment on Count II.

*David C. Schutter (Charles J. Ferrera* with him on the briefs; *Schutter, Cayetano, Playdon* of counsel), for Plaintiff-Appellant-Cross-Appellee.

*Edward Jaffe (Lorraine H. Akiba* with him on the briefs; *Cades, Schutte, Fleming & Wright* of counsel), for Defendants-Appellees-Cross-Appellants.

*Sidney K. Ayabe, Paul T. Yamamura (Libkuman, Ventura, Ayabe & Hughes* of counsel), for Amicus Curiae Real Estate Commission.

### DISSENTING OPINION OF WAKATSUKI, J.

I concur with the majority's decision on Count II, but respectfully dissent from the decision on Count I.

The majority, in my opinion, misplaces reliance on *Ikeoka.* In *Ikeoka,* the sale of the property in question was not subject to any conditions dependent on the acts of third parties. There was no offer made by the purchaser for acceptance by the seller. Further, the seller accepted $5000 in earnest money, cashed the check and advanced the broker a partial payment on his commission prior to refusing to execute the agreement of sale.

The material facts of this case are distinguishable. Here, a copy of a check in the sum of $1,000,000 payable to First American Title Insurance Company evidencing a deposit was attached to the DROA, but First American would not vouch for the value of the check. The record is

clear that the check was never accepted as a partial payment by the sellers. The language in the DROA and the June 13th letter of Fulcrum's attorney to Mr. Roy Kelley, construed strictly and in its plain meaning, clearly indicates that Fulcrum submitted an offer to purchase the hotels in question to the sellers for their acceptance.

The letter attached to the DROA states as follows:

"Dear Mr. Kelley:

For your review and files, enclosed is a copy of *our offer to purchase* the hotels discussed. The original and three (3) copies have been sent to Mr. Cotter. (Emphasis added.)

Cordially,

Henry Martin"

The material parts of the June 13th letter from Fulcrum's attorney to Mr. Roy Kelley states as follows:

"As you are aware, Fulcrum Capital Corporation met with Mr. Cotter in Los Angeles very soon after our meeting and submitted a *written offer* for the hotels on Thursday, June 12th. It is my understanding that three copies of the *offer* were sent to Mr. Cotter, and an additional copy was mailed to you.

My client, Fulcrum Capital Corporation is fully prepared to complete the purchase, and we are looking forward *to your acceptance of the offer.*"

(Emphasis added.)

The sellers never accepted the submitted offer, but instead, made a counter-offer to Fulcrum which was not accepted. Not having accepted the offer to purchase in writing, the DROA falls within the Statute of Frauds, and therefore, the DROA is unenforceable. *See,* Hawaii Revised Statutes § 656-1; *Carter v. Notley,* 32 Haw. 183, 187 (1931); *Cf., Perreira v. Perreira,* 50 Haw. 641, 642, 447 P.2d 667 (1968).

Furthermore, the special conditions contained in the DROA reiterates "an offer for acceptance", to-wit:

"8. SPECIAL CONDITIONS:

1. *This offer* is subject to any one of the following conditions:

a.) Buyer obtaining financing within 90 days of Seller's acceptance of this purchase contract

b.) Assignment of all ground leases and other leases.

c.) renegotiation of all ground leases to provide for such fixed terms as are necessary to obtain financing.

2. Seller shall *upon acceptance of this purchase contract* deliver

to buyer audited operating statements for the four hotels named herein covering periods 1975 to present year to date.

3. Buyer agrees that Mr. & Mrs. Roy Kelley shall have the use of .the Penthouse located in the "Waikiki Tower Hotel" for a period of five years from closing."

(Emphasis added.)

It is clear that the "offer to purchase" was subject to several material conditions. Based on the foregoing documents in evidence, the failure of the sellers to execute the DROA is not, as a matter of law, an act of bad faith. The sellers were entitled to reject the offer, or to propose a "counter-offer" to Fulcrum. *See, Honolulu Rapid Transit v. Paschoal,* 51 Haw. 19, 449 P.2d 123 (1968); *Francone v. McClay,* 41 Haw. 72, 78 (1955).

The April 28th listing agreement indicates that a commission of five per cent will be paid when the purchase is consummated. The pertinent paragraph of the listing agreement states as follows:

"It is presumed that if they purchase the properties, we will pay a commission based on five percent (5%) of the gross. If they fail to consummate the purchase within thirty days, the potential purchase will be null and void."

Fulcrum offered to purchase subject to, *inter alia,* two material conditions which the sellers had no control over; the obtaining of adequate financing from a lender, and the obtaining of favorable fixed-term ground leases to meet financing requirements that may be imposed by a lender. Even if the sellers executed the DROA, the sale may or may not have been consummated based on whether the two conditions enumerated in the DROA were met. Under these circumstances, it is inconceivable that Property House earned a commission by bringing forth to the sellers a potential purchaser, especially when the offer to purchase is subject to certain favorable actions by third parties. Absent a consummation of the sale in question, Property House should not be entitled to any commissions.

Property House had the burden to prove that there was a valid offer to purchase the hotels in question and a valid acceptance thereof; that Fulcrum was willing and able to perform, and that either the sale was consummated, or that the sellers breached the binding offer and acceptance agreement between Fulcrum and the sellers. Here, Property House failed in all respects.

I would affirm the trial court's decision for the foregoing reasons.