609 P.2d 345
**STATE of New Mexico,
Plaintiff-Appellee,**

v.

**Michael BRAMLETT,
Defendant-Appellant.**

**No. 4191.**

Court of Appeals of New Mexico.

March 13, 1980.

John B. Bigelow, Chief Public Defender, Melanie S. Kenton, Asst. Public Defender, Santa Fe, for defendant-appellant.

Jeff Bingaman, Atty. Gen., Marcia E. White, Asst. Atty. Gen., Santa Fe, for plaintiff-appellee.

## OPINION

WALTERS, Judge.

Defendant, convicted on one count of possession of methamphetamine and another count of possession of less than eight ounces of marijuana, appeals his convictions. He was acquitted of the charge of possession with intent to distribute marijuana. He contends that motions to suppress statements made by him to police and certain physical evidence, all of which was received in evidence at trial, should have been granted. We agree and reverse.

Los Alamos police officers responded to a call regarding a one-car accident near the Hilltop House. As they arrived, they saw defendant crossing the street. They talked to the woman at Hilltop House who had called the police, and located the disabled pick-up truck. They recognized it as one usually driven by defendant. One of the officers then began to look for defendant Bramlett and found him not far from the accident scene. He stopped Bramlett, inquired if he had been driving earlier that day and if he had been in an accident. Defendant responded "no" to both questions. The officer asked him to get into the patrol car, which Bramlett did, and they returned to the accident scene.

In the meantime, the police dispatcher had advised the investigating officers that the damaged vehicle was registered in the name of defendant's father. The officer who stopped defendant then advised him of his *Miranda* rights and he was again asked if he had been driving, if he had been involved in the accident, and how much he had drunk. Defendant answered "yes" to the first two questions and admitted that he had had several drinks. He was thereupon arrested for driving while intoxicated and a search was made of his pockets, socks and belt. A Doan's pill box containing marijuana, cigarette papers, and a "roach clip" were discovered on his person.

Bramlett was taken to the police station; he was booked at 4:50 p. m. A breathalyzer test administered there showed a .23 percent reading. Although released on his own recognizance by the magistrate contacted, the arresting officers ordered defendant held at the jail until he sobered up.

The officers then returned to the scene, arriving sometime between 6:00 and 7:00 p. m., and conducted an "inventory search" of the vehicle. The officers saw a "roach" attached to a surgical clamp on the passenger side of the seat. Searching further, they found on the floor of the cab a duffel bag and lunch box, both closed, and they examined the contents of each. A paper sandwich bag removed from the duffel bag was also opened, disclosing sandwiches and two plastic bags of marijuana. They opened another paper sack taken from the duffel bag and found five separately wrapped cellophane bags of marijuana in that sack. From inside the lunch box the officers removed a first-aid kit and, opening it, they saw a syringe containing a clear liquid (which one of the State's witnesses described a "controlled substance"), two surgical clamps, a glass bottle containing seeds, a pair of tweezers and a box holding six rolled cigarettes.

All of the items described above were seized. Around 8:00 p. m., the arresting officers returned to the jail; they obtained an "advice of rights" waiver from defendant, and again questioned him. One of the officers said Bramlett at the time was still intoxicated; the other felt he was "still having effects" of intoxication. As a result of that questioning, Bramlett admitted owning the duffel bag and the first aid kit, and their contents.

The motions to suppress were denied on grounds that "the evidence was seized as a result of a valid inventory search . . . and that the statements of defendant were obtained after he was advised of and waived his rights per *Miranda*."

The seized evidence was turned over to the State's trial prosecutor two days before trial and, over objection by defendant of failure in the chain of custody without testimony from the prosecutor, all of it was admitted at trial against defendant. Introduction of other evidence taken from defendant's person was not challenged on appeal. Refusal to suppress all challenged evidence removed from the duffel bag and lunch box was error.

The State carefully questioned the searching officers regarding "standard procedure" employed by the Los Alamos Police Department in making inventory searches, in an apparent effort to bring this search within some of the permissible bounds stated in *South Dakota v. Opperman*, 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976), and *Cady v. Dombrowski*, 413 U.S. 433, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973). The officers testified that it was standard proce-

dure to make inventory searches *"of the vehicle"* and to list the contents *"of the truck"* as the search proceeded; there is *no testimony* that it was standard procedure to open boxes and bags and all containers found in the truck, as well. Even if there were such evidence, we do not believe that a practice which goes beyond an "intrusion * * * limited in scope to the extent necessary to carry out the caretaking function," *Opperman, supra,* 428 U.S. at 375, 96 S.Ct. at 3100, could be approved as supplying the touchstone of reasonableness for the search. *State v. Clark,* 89 N.M. 695, 556 P.2d 851 (Ct.App.1976).

The purpose of this search, according to the officers, was (1) for "self protection"— to "guarantee that the items which are in the vehicle at the time we make the arrest * * * will be there when he goes to claim his vehicle"; and (2) to "safeguard against civil liability against the municipality." The Supreme Court has identified the development of the routine practice of securing and inventorying an automobile's contents as a permissible response to "three distinct needs: the protection of the owner's property while it remains in police custody, [citation]; the protection of the police against claims or disputes over lost or stolen property, [citation]; and the protection of the police from potential danger, [citation]." *Opperman, supra,* 428 U.S. at 369, 96 S.Ct. at 3097.

Because we hold that an inventory search must be limited to those situations where a vehicle has been impounded, that is, "taken into custody for the purpose of storage or safekeeping," *State v. Vigil,* 86 N.M. 388, 390, 524 P.2d 1004, 1006 (Ct.App. 1974), and to the breadth "necessary to carry out the caretaking function," *Opperman, supra,* 428 U.S. at 375, 96 S.Ct. at 3100; and that it is also necessary for this court "to exercise its independent judgment on the underlying constitutional issue[s] presented by the facts of this case," *Cady, supra,* 413 U.S. at 443, 93 S.Ct. at 2529, we scrutinize the record to determine whether there was justification for examination of the contents of containers found in the ve-

hicle during an alleged inventory search. In other words, we must determine whether conduct which would otherwise be classified as investigatory may be approved because it was called an inventory search.

*State v. Vigil, supra,* provides no facts surrounding the reason for the initial arrest to explain its holding that an inventory search permitted officers to open a locked car trunk after the car had been impounded. It does point out the violent conduct of the defendant after arrest, and because *Vigil* totally relies on *Cady v. Dombrowski* (the only case cited in *Vigil* which was concerned with an inventory search and which extended to search of a locked car trunk), we assume the *Vigil* facts approached those in *Cady.* There it was shown that the searching officer reasonably expected to locate a firearm in the vehicle, and it was standard procedure in such a situation "to retrieve the revolver . . . to protect the public from the possibility that a revolver would fall into untrained or perhaps malicious hands," 413 U.S. at 443, 93 S.Ct. at 2529. No such expectations were present in this case; both officers testified they had no probable cause to suspect any contraband in defendant's truck, and they were not "looking for anything specific." Nor should there have been the fear expressed in the unlocked glove compartment search of *Opperman, supra,* that the search into the duffel bag and lunch box here was made to protect contents "to which vandals would have had ready and unobstructed access." Fn. 10, 428 U.S. at 376, 96 S.Ct. at 3100. The items to which defendant objected in this case already had been left in the unattended, unlocked, untagged, open-windowed and open-bed truck for two hours before the investigating officers returned to make their "inventory" search. That fact alone—leaving it unattended and unsecured in a public area for that length of time—casts serious doubt not only on the real reason for the search, but upon the ownership of any items found in the course of the search. *Cf. Opperman, supra; Cady, supra.* Duffel bags are common repositories for personal effects; there is nothing about the appearance of a lunch

box which would permit the inference that it contained drugs. *Arkansas v. Sanders,* 442 U.S. 753, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979).

The search conducted of Bramlett's belongings was not merely an inventorying procedure. Having abandoned the vehicle to whomever chanced along for more than two hours, the warrantless intrusion in this case more closely approximated what the New Mexico Supreme Court condemned in *State v. Luna,* 94 N.M. 773, 606 P.2d 183 (1980). There, even though the Luna vehicle had been taken to the police station and actually was in the custody and control of the authorities, it was held that either probable cause and exigent circumstances, or a search warrant, was required to permit an investigatory search of the car. Both prerequisites were absent here.

We seriously question, also, whether the vehicle was in the "custody" of the authorities before or at the time the search was made. As we have noted, there were two hours between the arrest and search when it was in no one's custody. The inventory list describing the vehicle, its contents, the name of the wrecker company entrusted with the vehicle, and a copy of which was to be delivered to the wrecker company, could not be found. A search of the wrecker company's records did not turn up a copy of the inventory list, either; and it was the owner's recollection that defendant himself had called to have his truck towed in for repairs. The search was made at the scene of the accident, and the officer could not remember whether he called the tow truck before or after the search was conducted.

*State v. Luna, supra,* is susceptible of the interpretation that, under New Mexico constitutional protections, even after custody and control of a vehicle have been asserted by towing it to the stationhouse or police pound, a search of the scope engaged in here is not permitted by reason of custody alone.

■ Obviously, constitutional issues may not be resolved by looking for such magical incantations as "custody" and "inventory search" in the testimony of the witnesses.

There must be true custody, not merely verbal assertions of it. Knowing at the time defendant was first detained that the vehicle was registered to his father, no effort was made to notify the father before the officers determined to have it towed to a wrecker yard. Arrangements to have it picked up by its owner would have obviated the necessity for an "inventory search." And the search was not conducted at any place of impoundment; it was done at the arrest site. When these factors, together with the intensity of the search and the lack of probable cause which might have authorized a search warrant, are considered, we conclude that because of the presence of these "various factors indicating that the purported inventory search [was] not reasonably restricted in scope as to constitute a true inventory search" as "contrasted with making a warrantless search for incriminating evidence," *State v. Hatfield,* 364 So.2d 578 (La.1979), the search was unlawful.

All evidence seized in the so-called inventory search should have been suppressed.

■ Defendant has argued on appeal that no testimony regarding the statements given by Bramlett at the time he was stopped, when he was questioned again at the scene, and when the officers returned to the police station around 8:00 p. m., should have been allowed. The first statement denying any involvement in an accident was made before he was advised of his *"Miranda* rights" and at a time when he had been stopped as a suspect. Without citation to the record, the State contends that defendant "was not in custody [and] there were no restrictions on his movement" at that time. To the contrary, the officer testified he would have "persuaded" defendant to stay had he tried to walk away. Defendant was effectively in custody and entitled to be advised of his rights. The inconsistency of his first statement with his later admissions was testified to by the arresting officer. The court's finding that he had been "advised of and waived his rights per *Miranda*" with regard to that statement was contrary to the evidence.

Defendant's second statement, admitting his driving, his drinking, and the accident, was made at the scene after he had been returned there in the police patrol car and after the officer had read to him his "*Miranda* rights." The third statement was given at the police station after he had signed a written waiver of his rights. If those in-custody statements were made knowingly and voluntarily, testimony regarding their content was admissible. *State v. Crump*, 82 N.M. 487, 484 P.2d 329 (1971). "However, the voluntariness of a statement is not to be determined solely upon the presence or absence of an express statement of certain words. This determination must depend *in each case upon the particular facts and circumstances surrounding that case.*" *Crump, supra*, at 494, 489 P.2d at 336.

The officers testified that they believed Bramlett knew and understood what he had been advised when the second and third statements were given by him. In view, however, of their detailed description of his condition at 5:00 p. m.—staggering, slurred speech, difficulty in walking, strong alcoholic smell—and the intoxication test level of .23, it is difficult to reconcile their conclusion of his extreme intoxication with their opinion of his judgmental awareness of his rights and an intelligent waiver of them.

■■ We note, further, that these two officers decided at 5:00 p. m. that defendant was too intoxicated to be released; and they continued his detention in jail "for his own protection" after the third statement was taken around 8:00 p. m. Such restraint of an intoxicated person is allowed under § 43–2–22A, N.M.S.A.1978. But § 43–2–17A defines an intoxicated person as one "whose mental and physical functioning is so substantially impaired * * * that he has become * * * unable to care for his own safety." Is one's constitutional safety less worthy of protection than his physical safety? If defendant was so intoxicated that in the judgment of these witnesses he could not function safely, it is a contradiction of their own testimony and actions to

believe that their opposing assessment of his ability to understand constitutes sufficient evidence that the statements and the waivers were given knowingly and voluntarily. Such conflicting evidence from the same witnesses offends the standards of fundamental fairness under the due process clause, *see State v. Ramirez*, 89 N.M. 635, 556 P.2d 43 (Ct.App.1976), and is unworthy of the degree of belief necessary to sustain a finding of voluntary waiver. Even though there may be some evidence to support a finding, a reviewing court may and should reverse when convinced that the finding cannot be sustained by the preponderance of the evidence and the inferences therefrom, *Barber's Super Markets, Inc. v. Stryker*, 84 N.M. 181, 500 P.2d 1304 (Ct. App.1972), or, as is said in the federal courts, when the finding is "clearly erroneous" in light of the appellate court's "definite and firm conviction that a mistake has been committed." *Stegmaier v. Trammell*, 597 F.2d 1027, 1034 (5th Cir. 1979).

We hold that none of the statements made by defendant, under the circumstances present in this case, were admissible.

The cause is reversed and remanded for a new trial.

LOPEZ, J., concurs.

HENDLEY, Judge, (concurring in part and dissenting in part).

I concur in the majority opinion result with regard to the inventory search. I do it, however, on the reasoning set forth in *State v. Nemrod*, 85 N.M. 118, 509 P.2d 885 (Ct.App.1973), which was overruled by a different panel in *State v. Vigil*, 86 N.M. 388, 524 P.2d 1004 (Ct.App.1974).

I concur in the majority opinion with regard to the first statement. I disagree with regard to the second and third statements. There was conflicting evidence with regard to defendant's intoxication. Although I might have held differently, that is not the appellate review test. The appellate court does not weigh the evidence nor substitute its judgment for that of the fact finder. *State v. Lard*, 86 N.M. 71, 519

P.2d 307 (Ct.App.1974). The issue is whether there was substantial evidence. I believe there was substantial evidence to support the finding of mental capacity to understand the rights given and that the answers to questions were voluntary. *State v. Arellano*, 91 N.M. 195, 572 P.2d 223 (Ct.App. 1977).