2003-NMCA-046

64 P.3d 506

**STATE of New Mexico,**
**Plaintiff–Appellee,**

v.

**Barbara SPRIGGS–GORE,**
**Defendant–Appellant.**

No. 22,643.

Court of Appeals of New Mexico.

Jan. 3, 2003.

Certiorari denied, No. 22,884, Feb. 14, 2003.

**480**

Patricia A. Madrid, Attorney General, Margaret McLean, Assistant Attorney General, Santa Fe, NM, for Appellee.

Phyllis H. Subin, Chief Public Defender, Trace L. Rabern, Assistant Appellate Defender, Santa Fe, NM, for Appellant.

*OPINION*

PICKARD, Judge.

{1} Defendant appeals from an order confining her to a secure, locked facility for a period of fifteen years. This case offers our courts another opportunity to address New Mexico's Mental Illness and Competency statute (hereinafter the "Mental Illness and Competency statute"), NMSA 1978, §§ 31–9–1 through –1.5 (1988, as amended through 1999), which outlines procedures the trial court must follow in determining a criminal defendant's competency to stand trial and procedures for commitment in the event that a defendant is found incompetent. We determine that Section 31–9–1.5 does not abrogate a defendant's constitutional rights and hold that Defendant was incompetent, as a matter of law, to knowingly and intelligently waive her constitutional rights pursuant to *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). We also hold that, in light of recent United States Supreme Court holdings in *Ring v. Arizona*,

536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002) and *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), the procedures in the Mental Illness and Competency statute do not violate a defendant's constitutional right to due process. *See State v. Rotherham*, 1996–NMSC–048, 122 N.M. 246, 923 P.2d 1131 (evaluating the procedures of the Mental Illness and Competency statute and holding that the Mental Illness and Competency statute is not violative of a defendant's rights to equal protection under the law, substantive due process, or procedural due process). We reverse and remand to the trial court to conduct a new hearing pursuant to Section 31–9–1.5.

**FACTS AND BACKGROUND**

{2} Defendant is a 73–year–old woman with a very long history of mental illness, who was recently also diagnosed with dementia. On January 13, 2000, the Las Cruces police responded to a call regarding the apparent death of Defendant's husband at Defendant's home. After some initial confusion, the police determined that the death was a homicide and that Defendant was the likely perpetrator. At that time, a detective at the scene read Defendant her rights pursuant to *Miranda*. Another police officer was assigned to transport Defendant and ended up spending approximately five and one-half hours with her that day. This officer tape-recorded the entire five and one-half hours, which included a second reading of Defendant's *Miranda* rights and also included numerous inculpatory statements made by Defendant. Defendant states, and the State does not contest, that she was not taking any medication at the time of the offense. Defendant was transported to the hospital that afternoon, and then to the police station for booking, and then was sent to the Las Cruces jail. Defendant was indicted for first degree murder a week later.

{3} Defendant was evaluated at the Forensic Unit at Las Vegas Medical Center several weeks after the offense and was diagnosed as having a delusional disorder, persecutory type; sexual abuse of adult; paranoid personality disorder; and borderline intellectual functioning. Defendant had previously been diagnosed as having schizophrenia with

overtly psychotic symptoms. Following a hearing pursuant to Section 31–9–1.2 to determine Defendant's competency, the trial court found that Defendant was incompetent to stand trial, was not likely to be treated to competency, and was dangerous. The trial court then held a hearing pursuant to Section 31–9–1.5 and determined that there was sufficient evidence, by a clear and convincing standard, that Defendant committed second degree murder, which carries a maximum sentence of fifteen years. The trial court ordered that the Defendant be detained by the Department of Health, Las Vegas Medical Center, in a secure, locked facility for a period of fifteen years.

{4} At the Section 31–9–1.5 hearing, the trial court denied Defendant's motion to suppress statements made after each reading of her *Miranda* rights, and admitted most of the transcripts made from the five and one-half hours of tapes. The trial court also heard testimony from several police officers regarding the contents of these transcripts. Defendant appeals the trial court's denial of her motion to suppress statements made after the reading of her *Miranda* rights, alleging that they were taken in violation of her constitutional rights because she was incapable of a knowing and intelligent waiver of those rights. In this appeal, Defendant also argues that, in light of the United States Supreme Court's decisions in *Ring* and *Apprendi*, the procedural process in Section 31–9–1.5, which resulted in her being held in a secure, locked facility for fifteen years, violates her constitutional right to due process.

## POINT ONE—WAIVER OF FIFTH AMENDMENT RIGHTS

{5} Defendant argues only that she did not knowingly and voluntarily waive her Fifth Amendment rights under *Miranda*. Defendant does not argue that she was incapable of making voluntary statements due to insanity. She argues that she was found incompetent to stand trial due to her severe mental deficits and mental illness at a time when she was in an optimal treatment setting and taking five medications, and that she was far less competent on the date of offense and could not possibly have made a knowing and intelligent waiver of her rights on that day.

She further argues that the trial court followed the State's erroneous argument that Defendant had the burden to prove that her waiver of constitutional rights was involuntary, and that the court then applied an incorrect standard in admitting statements that were made after the defective waiver at the Section 31–9–15 hearing.

{6} The State argues that, pursuant to Rule 5–602(B)(3)(a) NMRA 2002, it is legally impossible to hold a suppression hearing after a defendant is found incompetent to stand trial, because the rule requires that proceedings in a criminal case must be stayed until a defendant becomes competent to stand trial. The State suggests that this issue is not appropriate for appellate review at this time and should be reversed and remanded to the trial court to conduct a hearing to suppress these statements if and when Defendant is found competent to stand trial and criminal proceedings recommence.

## Suppression of Statements at Section 31–9–1.5 Hearing

{7} We first must reject the State's argument that the suppression hearing is a legal impossibility at a hearing pursuant to Section 31–9–1.5. The statute does not preclude a defendant's attorney from putting on a complete defense at a Section 31–9–1.5 hearing. *State v. Gallegos*, 111 N.M. 110, 117, 802 P.2d 15, 22 (Ct.App.1990). The statute does allow for certain hearsay rules to be relaxed on secondary matters, and has been interpreted to prohibit a defendant from defending on the basis of insanity or inability to form specific intent, but does not otherwise abrogate any constitutional rights of a defendant. *Id.* The district court appropriately conducted a hearing on the suppression of Defendant's statements to the police made on the day of the offense.

## Standard of Review and Constitutional Requirement for Waiver of Rights

{8} The issue of voluntariness of Defendant's waiver of constitutional rights is reviewed by this Court de novo. *Cf. Aguilar v. State*, 106 N.M. 798, 799, 751 P.2d 178, 179 (1988) (applying de novo review to analogous issue of voluntariness of statements them-

selves). We examine the totality of the circumstances surrounding the waiver to reach an independent conclusion. *Cf. id.* In order for a defendant's waiver of *Miranda* rights to be constitutionally valid, the waiver must be voluntarily, knowingly, and intelligently made. *State v. Fekete*, 120 N.M. 290, 301, 901 P.2d 708, 719 (1995). For a waiver to be knowing and intelligent, it must be " 'made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.' " *Id.* (quoting *Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986)). The analysis of waiver must include an inquiry regarding both of these distinctions. *See Moran*, 475 U.S. at 452, 106 S.Ct. 1135. The State bears the burden of showing, by a preponderance of the evidence, that Defendant's waiver was voluntary, knowing, and intelligent. *Fekete*, 120 N.M. at 301, 901 P.2d at 719. Even though there may be some evidence to support a finding of voluntary waiver, this Court will reverse when convinced that the finding cannot be sustained by the preponderance of the evidence and the inferences therefrom. *State v. Bramlett*, 94 N.M. 263, 268, 609 P.2d 345, 350 (Ct.App.1980), *overruled on other grounds by Armijo v. State ex rel. Transp. Dep't*, 105 N.M. 771, 773, 737 P.2d 552, 554 (Ct.App. 1987). Courts indulge in every reasonable presumption against the waiver of a constitutional right. *State v. Boeglin*, 100 N.M. 127, 131, 666 P.2d 1274, 1278 (Ct.App.1983).

{9} Defendant does not argue that she was subjected to overreaching or coercion by the police. She argues that each *Miranda* warning, given first at the scene and then again at the hospital, was inadequate because, due to her intellectual shortcomings, she could not possibly knowingly and intelligently waive her constitutional rights. After reviewing the totality of the circumstances surrounding her waiver of constitutional rights, we agree.

**History of Proceedings Regarding Suppression of Defendant's Statements**

{10} The trial court held a hearing to address Defendant's competency to stand trial on May 10, 2001. *See* Section 31–9–1.2. On May 22, 2001, the trial court ruled that De-

fendant was incompetent to stand trial, was unlikely to be treated to competency, and was dangerous. The next day, defense counsel submitted a motion to suppress all statements made after Defendant was read her *Miranda* rights the first time, asserting that Defendant was incompetent to make a knowing, intelligent, and voluntary waiver of her rights. In that motion, counsel's argument invoked the evidence at the competency hearing, particularly the report of the neuropsychologist who testified at the hearing. The trial court heard arguments regarding Defendant's motion to suppress at the beginning of the Section 31–9–1.5 hearing on August 22, 2001.

{11} At that suppression hearing, Defendant submitted the neuropsychologist's report for the court's consideration on the issue of Defendant's inability to knowingly and intelligently waive her rights. Defendant also submitted transcripts of the five and one-half hours of statements taped by the police officer. The transcripts included the recitation of Defendant's second *Miranda* warning and Defendant's subsequent statements made to the police officers and hospital personnel, to which Defendant objected at this hearing. The judge ruled that all of Defendant's statements made up until the time she asked for an attorney, which included the objectionable statements, were proper and should not be suppressed.

{12} Defendant again objected to the admission of these statements on the same grounds twice during the hearing. Once was before testimony was heard regarding these statements from Officer Mills, who taped Defendant for five and one-half hours. The second time was in the middle of the proceedings when Defendant obtained permission to have a standing objection to all statements. Accordingly, we will review the competency hearing, the neuropsychologist's report, the transcripts of the five and one-half hours of taped statements, and the testimony of Officer Mills and Detective Cortez at the Section 31–9–1.5 hearing as the evidence concerning the totality of the circumstances surrounding Defendant's waiver of her constitutional rights.

## Evidence at Competency Hearing

{13} At the hearing to determine competency, the trial court heard testimony from a neuropsychologist who had performed extensive psychological and neurological testing on Defendant; a psychiatrist who had been treating Defendant in the Forensic Unit at the Las Vegas Medical Center (LVMC) for the previous two months, but had not done the original evaluations; and a psychological evaluator at LVMC. These experts testified as to the Defendant's competency to stand trial, but not on her competency to knowingly and intelligently waive her rights. They disagreed as to whether Defendant was competent to stand trial. Defendant's expert neuropsychologist, Dr. Thomas, testified that Defendant was suffering from dementia as well as her long-diagnosed psychosis, which greatly affected her memory. He also indicated that Defendant's forensic evaluation done at LVMC three weeks after her arrest indicated that Defendant showed significant deficits in reasoning, attention, and memory. The State's expert, Dr. Hilt from LVMC, opined that Defendant was competent to stand trial, but he did admit that without her medications Defendant's chances of understanding the proceedings were "pretty remote." Dr. Hilt also testified that he diagnosed Defendant as having dementia, although not as severe as Dr. Thomas's diagnosis. The State's other expert, evaluator McGahee, testified that when Defendant first arrived at LVMC, she exhibited an inability to converse for extended periods of time.

## Evidence at Section 31–9–1.5 Hearing

{14} At the Section 31–9–1.5 hearing, Detective Cortez testified that he read Defendant her *Miranda* rights at two different times. He first read them to her at her house, as soon as the police realized that they were at the scene of a homicide instead of an unattended death. He testified that he read the rights all together, then asked her if she understood them, to which she responded in the affirmative. He also testified that he thought Defendant understood them. The second reading of Defendant's rights occurred several hours later and was tape recorded and transcribed. When asked, Defendant indicated that she did not remember the detective telling her about her constitutional rights earlier in the day and she did not know to what constitution he was referring. A reading of the transcript reveals that Defendant did not seem to understand what was being read to her. In particular, she was quite confused when listening to the first three rights read:

**Detective Cortez:** 1. Okay, you have the right to remain silent.

2. Anything you say can and will be used against you in a court of law.

**Detective Tafoya:** Dave, what? Start up again and ask her if she understand that first one.

**Detective Cortez:** You understand them?

**Detective Tafoya:** The first . . .

**Spriggs–Gore:** I can't . . .

. . . .

**Detective Cortez:** 1. You have the right to remain silent.

**Spriggs–Gore:** I'm gonna . . .

**Detective Cortez:** You under—you understand that?

**Spriggs–Gore:** No.

**Detective Cortez:** 2. Anything you say can and will be used against you in a court of law.

**Spriggs–Gore:** Anything I say and can, anything I what now!

**Detective Cortez:** 2. Anything you say, meaning anything that you tell us . . .

**Spriggs–Gore:** Aha, can be held against me?

**Detective Cortez:** . . . can be . . .

**Spriggs–Gore:** Well!

**Detective Cortez:** . . . can and will be used against you in a court of law.

**Spriggs–Gore:** Okay.

**Detective Cortez:** Do you understand that?

**Spriggs–Gore:** Other words what I told you about going through the misery and pain . . .

**Detective Tafoya:** Hang on, now.

**Detective Cortez:** Ah–Ah hold on. Do you understand that?

Spriggs–Gore: Oh yes.

Detective Cortez: You do?

Spriggs–Gore: Aha.

Detective Cortez: Okay. I'll need a yes or no, ma'am?

Spriggs–Gore: I understand, yes.

Detective Cortez: Okay.

3. You have the right to talk to a lawyer and to have him present with you while you are being questioned.

Spriggs–Gore: Ah.

Detective Cortez: Okay.

Spriggs–Gore: I'm not spending-spending more time.

A few minutes later, at the end of the reading:

Detective Cortez: Having these rights in mind, would you want to give us a statement and . . .

Spriggs–Gore: About-about what statement are you talking about?

Detective Cortez: Ah . . .

Spriggs–Gore: Of what happened?

Detective Cortez: . . . about what happened?

Spriggs–Gore: I told you this, I know. In fact, you're confusing me! You're making me forget even what happened! I'm not, the way I'm I'm doing repeating it, I'm even going to forget what, what's really hap, what . . .

Detective Cortez testified that he had trouble getting Defendant's attention and getting her to focus during that second reading.

{15} Officer Mills recorded approximately five and one-half hours of conversation with Defendant. Officer Mills testified that she never had any concerns about Defendant's ability to understand what had happened and what was going on throughout the day. In spite of Officer Mills' testimony, a reading of the transcript made from her tapes reveals that Defendant talked nearly non-stop throughout the day, jumping from topic to topic without any provocation. The transcript reveals that, during the day, Defendant requested to be "put to sleep" numerous times; she forgot how many children she had; she seemed to think that the police were trying to get rid of "white people" so she was going to "get a hold of the president," and "tell him a thing or two"; she babbled at length about her childhood; she seemed to be unaware of her injuries when she got to the hospital; and she reported at the hospital that she had "plenty of bones broke in my body."

### Total Circumstances Do Not Show a Knowing and Intelligent Waiver

{16} It appears from the evidence examined above that the only evidence the trial court heard supporting Defendant's competency to knowingly and intelligently waive her constitutional rights at the time she was advised of those rights was the testimony from two police officers. One officer thought she understood the first reading of her rights, though he had his doubts about the second reading. The other officer testified that she did not have any concerns about Defendant's ability to understand what was happening throughout the day. The State made no other attempt to show that Defendant had any "awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Fekete*, 120 N.M. at 301, 901 P.2d at 719 (internal citation and quotation marks omitted).

{17} In contrast, the testimony of three experts who had evaluated the Defendant suggests that, unmedicated, Defendant's deficits in memory, reasoning, and ability to converse for an extended period are severely restricted. Both the neuropsychologist and the psychiatrist agreed that Defendant suffered from dementia, which has no cure, as well as various forms of psychosis. The transcripts of Defendant's statements made on the day of the offense reveal a woman who shows little, if any, understanding of her present circumstances, let alone her *Miranda* rights, and whose speech, at best, lacks coherency and, at worst, is simply babble. It is uncontested that Defendant was not medicated at the time of the offense, that she has a long history of severe psychosis, and that she was found incompetent to stand trial at a time when she had been in a treatment setting for months and had been regularly taking medications to control her psychosis.

{18} Accordingly, we hold, as a matter of law, that Defendant was incompetent to knowingly and intelligently waive her constitutional rights. *See Aguilar,* 106 N.M. at 799–800, 751 P.2d at 179–80 (finding that even though the defendant signed a waiver, had a tenth grade reading level, and appeared to have normal behavior during interrogation, his confession was involuntary due to evidence of subnormal intelligence and mental illness and due to his unquestionable difficulty in understanding the meaning of what police told him). Therefore, all of Defendant's statements made after the first administration of her *Miranda* rights must be suppressed. We reverse and remand to the trial court to conduct a new Section 31–9–1.5 hearing, disallowing the statements made after Defendant was advised of her *Miranda* rights, unless the State wishes the trial court to simply rule on the Section 31–9–1.5 issues on the basis of the existing evidence, but without the statements we hold must be suppressed. *Cf. State v. Post,* 109 N.M. 177, 181, 783 P.2d 487, 491 (Ct.App.1989) (indicating that, when evidence is suppressed on appeal, the prosecution may want to introduce additional or different evidence at retrial and that it has the right to do so, notwithstanding double jeopardy considerations); *In re Cherryhomes,* 103 N.M. 771, 775, 714 P.2d 188, 192 (Ct.App.1985) (holding that, when a contemnor is sentenced to a greater sentence than that allowable without a jury trial, the state may chose, on remand, whether to accept a lesser sentence without a retrial or retry the matter before a jury).

**POINT TWO–CONSTITUTIONALITY OF SECTION 31–9–1.5 AFTER *APPRENDI* AND *RING***

■ {19} Defendant challenges the constitutional validity of Section 31–9–1.5 in light of the United States Supreme Court's decisions in *Ring,* 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 and *Apprendi,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435. The *Ring* Court found that Arizona's capital sentencing statute, which allowed a trial judge, sitting without a jury, to determine aggravating factors necessary for imposition of a death sentence, could not be reconciled with its decision in *Apprendi* and with the Sixth Amendment. *Ring,* 122 S.Ct. at 2443. The decision affirmed *Apprendi* stating, "[i]f a State makes an increase in a defendant's authorized punishment contingent on the finding of a fact, that fact-no matter how the State labels it-must be found by a jury beyond a reasonable doubt." *Ring,* 122 S.Ct. at 2439. Defendant points out that, pursuant to Section 31–9–1.5, a defendant can be ordered held in a secure, locked facility for a period of time equal to a maximum sentence that could have been imposed had the defendant been convicted in a criminal proceeding, if a judge finds by clear and convincing evidence that an incompetent, dangerous defendant has committed the crime in question. *See* Section 31–9–1.5(D)(1), (2). If the judge does not find the incompetent defendant either dangerous or, by clear and convincing evidence, that defendant has committed the crime, then the judge must dismiss the criminal case without prejudice. *See* Section 31–9–1.5(B), (C). Defendant argues that ordering a defendant held in a secure, locked facility is a greater deprivation of liberty than dismissing a case without prejudice, even if the state commences a civil commitment proceeding pursuant to Section 31–9–1.5(B) and (C). Therefore, according to Defendant, under the reasoning of *Ring* and *Apprendi,* a jury, not a judge, must decide whether the defendant has committed the crime in question.

{20} The State asserts that New Mexico courts have found that Section 31–9–1.5 is constitutional, and further asserts that a commitment proceeding is different from the capital sentencing proceeding at issue in *Ring.* We agree with the State.

{21} In a comprehensive analysis of Section 31–9–1.5, our Supreme Court has concluded that "[t]he fact that a criminal defendant is detained for a period of time does not inexorably mean the State has imposed punishment. Rather, because the State seeks to treat an incompetent and to protect the community from danger, detention serves a regulatory rather than a punitive function." *Rotherham,* 122 N.M. at 262, 923 P.2d at 1147 (internal citations omitted). Commitment pursuant to Section 31–9–1.5 undeniably results in a loss of liberty. *Id.* Howev-

er, our Supreme Court has determined that Section 31–9–1.5 achieves an appropriate balance between a criminal defendant's liberty interest and the State's compelling interests of caring for its citizens when necessary and protecting its citizenry from danger. *Id.; see also Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) (outlining the balancing factors to determine what process is due before the government can infringe upon a constitutional interest). Therefore, our Supreme Court has found a "real distinction" between the purpose of commitment pursuant to Section 31–9–1.5 and a criminal prosecution. *See Rotherham,* 122 N.M. at 262, 923 P.2d at 1147.

{22} *Ring* and *Apprendi* both concern sentencing issues following a criminal trial, the purpose of which is to punish the individual who has been convicted of a crime. Commitment pursuant to Section 31–9–1.5 is not punishment. *See Rotherham,* 122 N.M. at 262, 923 P.2d at 1147. Therefore, we hold that *Ring* and *Apprendi* are not controlling because they concern proceedings that are not analogous to commitment proceedings pursuant to Section 31–9–1.5. We determine that, under our Supreme Court's reasoning in *Rotherham,* Section 31–9–1.5 does not unconstitutionally deprive defendants of due process.

{23} Defendant argues that there is a significant difference in the treatment of an individual who is civilly committed pursuant to the Mental Health and Developmental Disabilities Code (hereinafter the "Developmental Disabilities Code"), NMSA 1978, §§ 43–1–1 through –25 (1976, as amended through 1999), and one who is criminally committed pursuant to the Mental Illness and Competency statute. Further, she states, commitment pursuant to the Mental Illness and Competency statute effectively results in a greater deprivation of her liberty. She argues that the Mental Illness and Competency statute requires the state to treat her only to attain competency, but not to treat her for issues relating to her dangerousness and her accompanying mental illness and disability, as would be required by the Developmental Disabilities Code. Defendant notes that Justice Minzner pointed out this very concern in her special concurrence in *Rotherham,* writing that the majority opinion did not go far enough in its analysis of Section 31–9–1.5. 122 N.M. at 267–68, 923 P.2d at 1152–53 (Minzner, J., specially concurring).

{24} However, the majority in *Rotherham* held that Section 31–9–1.5 "requires treatment and, when necessary, the treatment shall be the same as that under the [Developmental Disabilities Code]." 122 N.M. at 256, 923 P.2d at 1141. The majority opinion further held that the type of treatment rendered under the Developmental Disabilities Code shall not be denied a defendant committed under Section 31–9–1.5 when that treatment is necessary. *Id.* at 256–57, 923 P.2d at 1141–42. Because the trial court orders and then monitors treatment for individuals pursuant to Section 31–9–1.5, the majority in *Rotherham* determined that the trial court should inquire into the sufficiency of treatment that has been and will be rendered in the future. *Id.* at 257, 923 P.2d at 1142. We note that the trial court must review Defendant's competency and dangerousness status every two years and it has the authority to release the Defendant if she is no longer dangerous, which is an additional check on Defendant's liberty interest and due process rights. *See* Section 31–9–1.5(D)(4)(b), (c).

{25} Pursuant to the holdings in *Rotherham,* we see no substantive difference between the treatment rendered in a civil commitment and the treatment rendered in a criminal commitment. The difference is not a difference in "punishment" or a greater deprivation of liberty, as Defendant asserts. Moreover, we determine that, if Defendant requires a change in her treatment or experiences a change in her level of competency or dangerousness, the Mental Illness and Competency Statute allows for a petition to the trial court for redress. *See* Section 31–9–1.5(D)(3), (4).

## CONCLUSION

{26} We reverse and remand to the trial court to conduct a new Section 31–9–1.5 hearing consistent with this opinion.

{27} **IT IS SO ORDERED.**

WE CONCUR: MICHAEL D. BUSTAMANTE and IRA ROBINSON, Judges.