# IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

**Opinion Number:** _____

**Filing Date:** _____

**NO. 29,899**

**STATE OF NEW MEXICO**,

      Plaintiff-Appellee,

v.

**JAMES TSU**,

      Defendant-Appellant.


**APPEAL FROM THE DISTRICT COURT OF SAN JUAN COUNTY**
John A. Dean, Jr., District Judge

Hugh W. Dangler, Chief Public Defender
Nina Lalevic, Assistant Appellate Defender
Santa Fe, NM

for Appellant

Gary K. King, Attorney General
Nicole Beder, Assistant Attorney General
Santa Fe, NM

for Appellee

# DECISION

**MAES, Justice.**

{1}     James Tsu (Defendant) was charged with an open count of murder in the first degree, contrary to NMSA 1978, Section 30-2-1 (1980), and tampering with evidence, contrary to NMSA 1978, Section 30-22-5(B)(1) (2003), in connection with the brutal killing of his mother, Caroline Tsu (Victim).  Following a hearing conducted pursuant to the New Mexico Mental Illness and Competency Code, NMSA 1978, §§ 31-9-1 to -4 (1967, as amended through 1999), the district court ordered Defendant to be "committed to the custody of the Department of Health to be held in a secure, locked facility for life."  Defendant appeals directly to this Court pursuant to Rule 12-102(A)(1) NMRA, claiming that:  (1) the district court improperly found that Defendant had committed the crime of murder in the first degree because the court relied on statements made during a mental examination in violation of Rule 5-602(E) NMRA, and the evidence was insufficient to prove that the killing was willful, deliberate, and premeditated; (2) the district court improperly denied Defendant's motion to suppress certain statements he had made to the police because Defendant had not knowingly, intelligently, or voluntarily waived his *Miranda* rights; and (3) NMSA 1978, Section 31-9-1.5 (1999) violates Defendant's right to a jury trial guaranteed by the Sixth Amendment to the United States Constitution.  We affirm the decision of the district court.

## I.  FACTS AND PROCEDURAL HISTORY

{2}     The record reflects the following facts.  In the fall of 2003, Defendant moved to Aztec, New Mexico to live with Victim and James Randol Calhoun, III, Defendant's step-father.  Defendant's native language is Mandarin Chinese.  Although Defendant speaks and understands English well enough to engage in the ordinary activities of daily life, he is more comfortable communicating in Mandarin Chinese than in English.

{3}     On March 5, 2004, Calhoun arrived home from work at approximately 7:00 p.m.  Defendant was standing outside of the house, and as Calhoun approached, Defendant said, "She's dead."  Calhoun assumed that "maybe [Defendant] didn't really understand what he was saying," so he asked Defendant, "Well, how's your mother doing."  Defendant responded by saying, "She's dead."  Calhoun dialed 911 and summoned emergency services.

{4}     Deputy Robert Shane Ferrari with the San Juan County Sheriff's Office and Officer Paul Gonzales with the New Mexico State Police were the first officers to arrive at the scene.  Deputy Ferrari and Officer Gonzales briefly spoke to Calhoun, who informed them that "he didn't know what the situation was, that his wife was hurt."  Calhoun also informed them that Defendant "was at the house and [that the Officers should] be careful because he was mentally ill."

{5}     When Deputy Ferrari and Officer Gonzales encountered Defendant outside of the house, they ordered him "to get down . . . to show [them] his hands and also to get on the ground." Defendant complied with these orders, and Officer Gonzales handcuffed Defendant, patted him down for weapons, and asked him for identification. Defendant indicated that his identification could be found inside his right front pocket. Officer Gonzales found Defendant's New Mexico driver's license in the location Defendant had indicated. At this point, Officer Gonzales asked Defendant if he understood English. Defendant responded affirmatively and Officer Gonzales advised Defendant of his *Miranda* rights in English.

{6}     As Deputy Ferrari prepared to enter the home, Officer Gonzales asked Defendant if anyone else was inside. Defendant explained that Victim was inside, but stated that "she's dead." Officer Gonzales asked Defendant, "how do you know she's dead?" to which Defendant responded, "because I beat her."

{7}     When Deputy Ferrari entered the home, he found a red blood-like substance on the floor, which "somebody had tried to wipe up." He proceeded to the master bathroom, where he found the body of Victim, naked from the waist-down, lying in a pool of blood in the bathtub. Victim's throat had been slit and her external genitalia had been removed. A meat cleaver was found resting on Victim's stomach and two knives were found lying on the bathroom countertop.

{8} Subsequent forensic investigation revealed that Victim first had been attacked near the front door of the home with a large blunt object similar to a baseball bat. Victim sustained a broken arm, a broken leg, and head trauma, which likely rendered her unconscious. Thereafter, Victim was carried or dragged to the bathtub in the master bathroom, where she received "two deep slicing cuts to the sides and back of [her] throat." These slicing cuts resulted in Victim's death by exsanguination. Afterward, Victim's external genitalia had been removed with a meat cleaver.

{9} During their search of the home, the police found Victim's excised vagina in a bowl in the freezer. Defendant's bloody fingerprint was found on the bowl. Additionally, various items were seized from the home, including a bloody towel and a bloody sock. Subsequent DNA analysis revealed that the blood on the sock belonged to Victim, whereas the blood on the towel belonged to both Victim and Defendant.

{10} The police also found a yellow tablet in Defendant's bedroom which contained various statements written in Mandarin Chinese. These statements, as translated into English, included the following:

"My Dad and Mom both deserve to be killed, cut off slowly"
"kill the old third"
"Randy this guy surely is worse than M"
"M in the US so many years has been fooling around, doing this and that"
"To kill is not necessary on Christmas Eve"
. . . .

4

"M came home earlier than usual, was not able to sharpen the knife"
"kill Grace Pillo"
"must let him (or her) understand a bit more otherwise, will be hurt or destroyed without understanding"

{11}	Later that evening, Defendant was transported to the San Juan County Sheriff's Office where he was interviewed by Detective Scott Charles. Detective Charles advised Defendant of his *Miranda* rights in English prior to commencing the interview. During the interview, Defendant made various statements inculpating himself in Victim's murder.

{12}	On September 27, 2004, the district court held a competency hearing pursuant to NMSA 1978, Section 31-9-1.1 (1993). The court determined that Defendant was incompetent to stand trial, and both the State and Defendant stipulated that Defendant was dangerous as defined by NMSA 1978, Section 31-9-1.2(D) (1999). The court therefore committed Defendant to the custody of the Department of Health "for treatment to enable the defendant to attain competency to proceed in [his] criminal case." *See* § 31-9-1.2(B).

{13}	On November 22, 2005, the State and Defendant stipulated that Defendant had failed to make any progress toward attaining competency and that Defendant would not attain competency within nine months of the original competency finding. *See* NMSA 1978, § 31-9-1.3(E) (1999); NMSA 1978, § 31-9-1.4(A) (1999). Accordingly,

the district court scheduled a hearing to determine whether Defendant should be committed criminally pursuant to Section 31-9-1.5.

{14} In the meantime, Defendant moved to suppress all of the statements he had made to Officer Gonzales and Detective Charles, claiming that he had not knowingly, intelligently, or voluntarily waived his *Miranda* rights. Specifically, Defendant argued that his "primary language is Chinese" and that he "did not understand the rights he was giving up because of his limited English." Additionally, Defendant argued that he had been "incompetent and delusional" due to mental illness, and therefore he had been incapable of knowingly, intelligently, or voluntarily waiving his *Miranda* rights.

{15} The district court conducted a joint hearing on Defendant's motion to suppress and Defendant's competency, dangerousness, and commission of the crime of murder in the first degree pursuant to Section 31-9-1.5. At the hearing, Defendant offered the expert testimony of Dr. Patricia Kelly, a forensic psychiatrist, in support of his motion to suppress. Dr. Kelly testified that she had examined Defendant personally, watched the videotape of Defendant's interview with Detective Charles, and reviewed Defendant's medical history. On the basis of this information, she had determined that Defendant suffers from schizophrenia and that at the time of his arrest he was in a psychotic state. Dr. Kelly explained that "when somebody is psychotic, it's hard for them to know what they are doing." Therefore, it was her opinion, within a

reasonable degree of medical certainty, that Defendant did not understand the nature of his *Miranda* rights or the consequences of abandoning those rights at the time his statements were made.

{16} The district court denied Defendant's motion to suppress the statements made to Officer Gonzales, but granted Defendant's motion to suppress the statements made to Detective Charles. The court found that Defendant's compliance with Officer Gonzales's orders, as well as his appropriate responses to Officer Gonzales's questions, "demonstrate[d] that Defendant was aware of what was transpiring at that time and that he understood English." Therefore, the court held that Defendant had "knowingly and intelligently waived his *Miranda* rights when he spoke to Officer Gonzales." With respect to Defendant's statements to Detective Charles, however, the court noted that Detective Charles had questioned Defendant's mental status during the interview, and that Dr. Kelly, who had watched a videotape of the interview, testified that Defendant was in a psychotic state at that time. Accordingly, the court held that the State "had failed to show by a preponderance of the evidence that the Defendant knowingly and intelligently waived his right to remain silent and his right to the assistance of an attorney when he was interviewed by Detective Charles."

{17} With respect to whether Defendant should be committed criminally under Section 31-9-1.5, Defendant conceded that the evidence was sufficient to establish that

7

he had killed Victim. Defendant argued, however, that "not a single piece of the evidence in this case suggests any deliberation." Rather, Defendant claimed that the brutality of the murder indicated that it had been committed in a sudden rage or a psychotic state. Accordingly, Defendant suggested that, at most, the evidence supported a finding that he had committed the crime of murder in the second degree in violation of Section 30-2-1(B), and therefore, the maximum period of criminal commitment was fifteen years.

{18} The district court rejected Defendant's claim, concluding that "[t]he State had established by clear and convincing evidence that the Defendant killed [Victim] with the deliberate intention to take away her life, constituting the felony of [first] degree murder." With respect to Defendant's intent, the Court noted that "[t]he location of the beating indicates that the Defendant was armed and ready to attack the victim at the door."

> The manner of death required an extended time to complete, having been accomplished in stages. It took time and effort to transfer the victim to the master bathtub after the beating did not kill her. The deep slicing wounds to the throat were intentional and inflicted on an area of the body that were sure to be fatal to the victim who was still alive.

Additionally, the court determined that Defendant's written statements, found on the yellow tablet in his bedroom, indicated that "prior to the homicide the Defendant harbored an ongoing intention to kill." Indeed, "[h]is notation of an interruption to sharpening 'the' knife indicates forethought about his choice of weapon and

8

preparation of the weapon." Lastly, the court noted that "[t]he excision and preservation of the victim's external genitalia indicate that removing and obtaining this portion of his mother's body was important to the Defendant and was considered part of his plan."

{19} Accordingly, the district court held that: (1) Defendant committed the crime of murder in the first degree; (2) Defendant was dangerous as defined by Section 31-9-1.2(D); and (3) Defendant was incompetent to proceed to trial on the merits. "[F]or the public's protection and for [the] continued treatment" of Defendant, the district court committed Defendant "to the custody of the Department of Health to be held in a secure, locked facility for life, the maximum sentence that could have been imposed . . . ." *See* § 31-9-1.5(D)(2) (providing that a defendant may be committed criminally for "the period of time equal to the maximum sentence to which the defendant would have been subject had the defendant been convicted in a criminal proceeding"). This direct appeal followed.

**II.     DISCUSSION**

**A.     Whether the district court properly concluded that Defendant committed the crime of murder in the first degree.**

{20} Defendant first claims that the district court's conclusion that he had committed the crime of murder in the first degree must be reversed because: (1) it was based, at least in part, on statements that Defendant had made during a mental examination in

violation of Rule 5-602(E); and (2) the evidence was insufficient to establish that the murder was willful, deliberate, and premeditated.

**1.      Whether the district court violated Rule 5-602(E).**

{21}      The record reflects that the district court relied on statements Defendant had made during his psychiatric evaluations with Dr. Kelly to find the following facts: (1) "The Defendant told Dr. Patricia L. Kelly during psychiatric evaluations in 2006 that he killed his mother by beating her, cutting her throat and removing a body part"; (2) "The Defendant also told Dr. Kelly that when Mr. Calhoun arrived [home on March 5, 2004], the Defendant said to Mr. Calhoun, 'I killed her'"; and (3) "The Defendant told Dr. Kelly in 2006 regarding his mother's marriage to Randy Calhoun that 'If a woman has no shame . . . she will be revenged.'" Although Defendant failed to object to the district court's reliance on these statements, he now claims on appeal that this reliance violates Rule 5-602(E). *See* Rule 5-602(E) ("A statement made by a person during a mental examination or treatment subsequent to the commission of the alleged crime shall not be admissible in evidence against such person in any criminal proceeding on any issue other than that of the person's sanity, ability to form specific intent or competency to stand trial.").

{22}      We need not decide whether the district court's reliance on these statements was improper under Rule 5-602(E), because we conclude that the alleged error was invited by Defendant. "[T]o allow a defendant to invite error and to subsequently complain

10

about that very error would subvert the orderly and equitable administration of justice." *State v. Handa*, 120 N.M. 38, 45-46, 897 P.2d 225, 232-33 (Ct. App. 1995) (internal quotation marks and citation omitted). "Furthermore, the doctrine of fundamental error has no application in cases where the defendant, by his own actions, invites error." *Id.* at 46, 897 P.2d at 233.

**{23}** During the joint hearing, Defendant informed the district court that it properly could rely on statements Defendant had made during his psychiatric evaluations with Dr. Kelly to find that Defendant had killed Victim. Defendant explained that

> [i]t seems somewhat straightforward the answer to the first question, did [Defendant] kill his mother. He seems to think so because regardless of whether you suppress the statements [to Officer Gonzales and Detective Charles], he told his doctors that and you would have that evidence. *It's proper for the Court to look at that evidence that was submitted in the—I'm sorry—in a prior competency hearing.* You can review that, although [the State] didn't refer to it. So I think it's fairly obvious.

(Emphasis added.) Because Defendant invited the alleged error, he cannot now raise it on appeal as grounds for reversal.

**2. Whether the evidence was sufficient to establish that the murder was willful, deliberate, and premeditated.**

**{24}** To commit a defendant criminally for the crime of murder in the first degree in violation of Section 30-2-1(A), the district court must find, by clear and convincing evidence, that an incompetent and dangerous defendant killed another human being with deliberate intent. *See* § 31-9-1.5(D); § 30-2-1(A). "Clear and convincing

11

evidence is evidence that instantly tilt[s] the scales in the affirmative when weighed against the evidence in opposition and the fact finder's mind is left with an abiding conviction that the evidence is true." *State v. Adonis*, 2008-NMSC-059, ¶ 11, 145 N.M. 102, 194 P.3d 171 (internal quotation marks and citation omitted).

> In reviewing the sufficiency of the evidence to support Defendant's commitment for first-degree murder, we must be careful not to substitute our judgment for that of the district court. While we exercise restraint in conducting this review, we must nevertheless subject the evidence presented at the hearing to careful scrutiny to ensure that any rational fact finder could have found . . . the essential facts required to order Defendant's commitment for first-degree murder. If the State failed to present sufficient evidence to support the district court's order committing Defendant for first-degree murder . . . then the court's commitment order was entered in error . . . .

*Id.* ¶ 12 (internal quotation marks and citations omitted).

{25}    A willful, deliberate, and premeditated killing is "a killing with the deliberate intention to take away the life of another." *State v. Garcia*, 114 N.M. 269, 271, 837 P.2d 862, 864 (1992) (internal quotation marks and citation omitted). Although Section 30-2-1 does not define the term "deliberate," our Uniform Jury Instructions for Criminal Cases provide that

> [t]he word deliberate means arrived at or determined upon as a result of careful thought and the weighing of the consideration for and against the proposed course of action. A calculated judgment and decision may be arrived at in a short period of time. A mere unconsidered and rash impulse, even though it includes an intent to kill, is not a deliberate intention to kill. To constitute a deliberate killing, the slayer must weigh

12

and consider the question of killing and his reasons for and against such a choice.

UJI 14-201 NMRA. "Deliberate intent may be inferred from the particular circumstances of the killing as proved by the State through the presentation of physical evidence." *State v. Duran*, 2006-NMSC-035, ¶ 8, 140 N.M. 94, 140 P.3d 515 (holding that "a reasonable jury could have believed Defendant had the deliberate intent to kill the victim by inferring from the physical evidence of a prolonged struggle and multiple stab wounds"); *see also State v. Cunningham*, 2000-NMSC-009, ¶ 28, 128 N.M. 711, 998 P.2d 176 (holding that the evidence was sufficient to support deliberate intent, because the defendant retrieved the fatal weapon and fired the fatal shot after the victim was incapacitated and defenseless).

**{26}** In the present case, the physical evidence established that Defendant first attacked Victim at the front door of the home, where he struck her repeatedly with a large blunt object. After Victim lost consciousness, Defendant carried or dragged her to the master bathroom, where he lifted her into the bathtub. At this point, Defendant went to the kitchen to retrieve the meat cleaver and knives that he subsequently used to slit Victim's throat and excise her vagina. Alternatively, the meat cleaver and knives were already present in the bathroom, evidencing Defendant's prior intention to use them on Victim. In either case, the severity of the Victim's wounds, the prolonged nature of the attack, and the retrieval and use of various weapons to

13

incacitate, kill, and mutilate Victim, are sufficient to support a factual finding that the killing was committed with deliberate intent.

{27} In addition to the physical evidence, Defendant's statements, memorialized on the yellow tablet found in his bedroom, indicated that the killing was willful, premeditated, and deliberate. *See State v. Rojo*, 1999-NMSC-001, ¶ 24, 126 N.M. 438, 971 P.2d 829 (holding that the length of time it took to kill the victim, combined with evidence of motive, was sufficient to establish deliberate intent). Prior to the murder, Defendant wrote that, "[m]y Dad and Mom both deserve to be killed, cut off slowly" and "M came home earlier than usual, was not able to sharpen the knife." This evidence, when considered in combination with the physical evidence, was sufficient to support the district court's factual findings that "Defendant harbored an ongoing intention to kill" and had given "forethought [to] his choice of weapon and preparation of the weapon." Accordingly, Defendant's sufficiency of the evidence claim fails.

**B. Whether the district court properly denied Defendant's motion to suppress statements made to Officer Gonzales.**

{28} Defendant next claims that the district court improperly denied his motion to suppress the statements he had made to Officer Gonzales. Defendant argues that he was in a psychotic state at the time he made these statements, and therefore, he was incapable of knowingly, intelligently, or voluntarily waiving his constitutional rights under *Miranda*.

14

{29} We need not decide whether the district court improperly denied Defendant's motion to suppress, because we conclude that the admission of this evidence, even if erroneous, was harmless beyond a reasonable doubt. In *State v. Barr*, No. 30,191, slip op. at 12 (May 22, 2009), we clarified that, in the context of constitutional error, "a reviewing court should only conclude that an error is harmless when there is no reasonable *possibility* [that the error] affected the verdict." In determining whether there is a reasonable possibility that the improperly admitted evidence affected the outcome of the proceeding, it is appropriate to consider whether there is:

> (1) substantial evidence to support the conviction without reference to the improperly admitted evidence; (2) such a disproportionate volume of permissible evidence that, in comparison, the amount of improper evidence will appear minuscule; and (3) no substantial conflicting evidence to discredit the State's testimony.

*Id.* ¶ 56.

{30} In the present case, there was overwhelming physical evidence establishing that Defendant had killed Victim. Indeed, at the joint hearing Defendant did not dispute that he had killed Victim, but instead claimed only that he lacked the heightened mental state necessary to commit the crime of murder in the first degree. *See supra,* part II.A.2. Because it was essentially undisputed that Defendant had killed Victim, and because Defendant's statements to Officer Gonzales pertained only to his commission of the killing and not to his disputed mental state, we conclude that the admission of this evidence was harmless. Stated another way, there is no reasonable

15

possibility that the alleged improper admission of Defendant's statements to Officer Gonzales had any impact on the district court's determination that Defendant had committed the crime of murder in the first degree, and therefore, should be committed criminally under Section 31-9-1.5.

**C.      Whether Section 31-9-1.5 violates the Sixth Amendment to the Federal Constitution.**

{31}      Lastly, Defendant claims that Section 31-9-1.5 violates the Sixth Amendment to the Federal Constitution pursuant to *Ring v. Arizona*, 536 U.S. 584 (2002), because it permits the district court, rather than a jury, to determine whether there is sufficient evidence to find that the defendant had committed the crime charged. In *State v. Spriggs-Gore*, 2003-NMCA-046, ¶ 21, 133 N.M. 479, 64 P.3d 506, the Court of Appeals addressed this precise issue. The Court noted that detention under Section 31-9-1.5 "serves a regulatory rather than a punitive function." *Id.* (internal quotation marks and citation omitted). By contrast, *Ring* and *Apprendi v. New Jersey*, 530 U.S. 466 (2000), "both concern sentencing issues following a criminal trial, the purpose of which is to punish the individual who has been convicted of a crime." *Spriggs-Gore*, 2003-NMCA-046, ¶ 22. Accordingly, the Court held that "*Ring* and *Apprendi* are not controlling because they concern proceedings that are not analogous to commitment proceedings," and therefore Section 31-9-1.5 does not violate a defendant's federal constitutional right to a jury trial. *Id.*

16

**{32}** Recently, in *Adonis*, 2008-NMSC-059, ¶ 10, we affirmed the Court of Appeals' holding in *Spriggs-Gore* and the constitutionality of Section 39-1-1.5. Defendant has failed to provide us with a compelling reason to distinguish or to overrule *Adonis* and *Spriggs-Gore*. *See Martinez v. City of Las Vegas*, 2004-NMSC-009, ¶ 24, 135 N.M. 375, 89 P.3d 47 ("Based on the importance of stare decisis, we require a compelling reason to overrule one of our prior cases." (internal quotation marks and citation omitted)). We therefore reject Defendant's constitutional claim.

## III. CONCLUSION

**{33}** We affirm the decision of the district court committing Defendant to the custody of the Department of Health in a secure locked facility for life under Section 31-9-1.5.

**{34}** **IT IS SO ORDERED.**

_____
**PETRA JIMENEZ MAES, Justice**

17

**WE CONCUR:**

_____
**EDWARD L. CHÁVEZ, Chief Justice**

_____
**PATRICIO M. SERNA, Justice**

_____
**RICHARD C. BOSSON, Justice**

_____
**CHARLES W. DANIELS, Justice**

18